SOUTHWESTERN BELL TELEPHONE
COMPANY et al, Appellants,

v.

David SIMS et al, Appellee.

No. 17728.

Court of Civil Appeals of Texas,
Houston (1st Dist.).

March 12, 1981.

Dick Billeaud, Todd Lonergan, Houston, for appellants.

Foster, Pope & Orsak, Michael E. Orsak, Sugarland, for appellee.

PEDEN, Justice.

Southwestern Bell Telephone Company, and the driver of its truck, J. C. Gonzales, appeal from a judgment rendered on jury findings awarding $65,582.70 to plaintiffs David Sims and Roy Sims in a suit arising out of a non-collisional accident at an intersection in Richmond, Fort Bend County.

The plaintiffs alleged that a Bell Co. truck driven by Gonzales negligently ran a stop sign and pulled out in front of a dump truck owned by Roy Sims and driven by his brother, David Sims, causing David to swerve and overturn to avoid a collision; that the accident resulted in damage to the truck, lost profits to the hauling business of Roy Sims while the truck was being repaired, and personal injuries to David Sims. The appellants contend that the trial court erred in admitting and excluding evidence, in refusing to grant a continuance, and in refusing to excuse one juror from the panel. The appellants also urge that the amounts of the jury's awards to the plaintiffs were against the great weight of the evidence and that the court erred in refusing to hold that David Sims was negligent as a matter of law and in refusing to enter judgment *non obstante veredicto* on that basis. We affirm.

The appellants' first three points of error are that the trial court erred 1) in excluding the affirmative answer of David Sims when he was asked if he knew that the intersection where the accident occurred was a dangerous one, 2) in ordering such answer stricken and in instructing the jury to disregard it, and 3) in refusing to allow the eliciting of testimony from David Sims as to what he had heard about previous accidents at the intersection in question.

The appellants alleged that David Sims was negligent in that he failed to keep a proper lookout for other vehicles in the road, drove his vehicle at an excessive and dangerous speed under the circumstances, failed to apply his brakes properly, failed to keep his vehicle under proper control, and failed to sound his horn or give any notice of his approach.

In response to issues inquiring as to the conduct of David Sims, the jury did not find that on the occasion in question a) he "ap-

proached the intersection of Golf View Drive and Thompson at a greater rate of speed than a person using ordinary care would have approached such an intersection," or b) he failed to keep a proper lookout. The jury also did not find that David Sims failed to properly apply his brakes to avoid the accident.

David Sims testified that he was very familiar with the intersection. He was traveling within the speed limit as he approached it in his brother's dump truck on a clear day, and he was about 300 yards from the intersection when he first saw the telephone company truck approaching from his left. He looked to his right, then again to his left; he saw the company truck, still moving toward the stop sign, then he looked to his right again. He did not slow down. When he next saw the Bell truck it was in front of him. He applied his brakes and turned hard to his right, and his truck turned over. The police officer who investigated the accident testified that David Sims laid down 161 feet of skid marks.

The appellants complain about the trial judge's having instructed the jury to disregard the answer of David Sims that he knew the intersection was a dangerous one. They contend that he was negligent in admittedly approaching it at a rate only a little below the speed limit without sooner applying his brakes and without keeping a better lookout.

We do not agree. No relationship was shown, by bill of exception or otherwise, between any danger in the intersection known to David Sims and the danger he encountered; i. e., the failure of a vehicle on the cross-street to stop for the stop sign facing it. Had it been shown that David Sims knew the intersection was dangerous because that stop sign was obscured, for example, it would have been error to exclude evidence of his knowledge of that fact. On the other hand, if he knew that the intersection was dangerous because the roadway was slippery when wet, evidence of that knowledge would not be relevant when, as here, the accident happened on dry roads.

The first three points of error are overruled.

The appellants next complain that the trial court erred in failing to direct a verdict in their favor and in overruling their motion for judgment *non obstante veredicto* because David Sims was negligent as a matter of law.

The trial court had a duty to render judgment in accordance with the jury's findings unless the answers to the special issues had no support in the evidence; judgment *non obstante veredicto* is proper only where a directed verdict would have been proper. Rule 301, Tex.R.Civ.Proc. *Burt v. Lochausen*, 151 Tex. 289, 249 S.W.2d 194 (1952).

The court may not refuse to submit an issue or disregard the jury's answer to it merely because the evidence is factually insufficient to support the answer. *Garza v. Alviar*, 395 S.W.2d 821, 824 (Tex.1965). A complaint that the trial court erred in failing to grant a motion for directed verdict or judgment *non obstante veredicto* raises only "no evidence" points for purposes of appeal. *See Chemical Cleaning, Inc. v. Chemical Cleaning & Equipment Service, Inc.*, 462 S.W.2d 276 (Tex.1970).

In reviewing no evidence points we consider only evidence tending to prove the non-movant's case. In our case defendant Gonzales testified that on the afternoon of the accident he followed some cement workers in a green station wagon to Thompson Road and saw them turn into the Smoke House. On that afternoon witness Elijah White was taking three cement workers in his green station wagon from a concrete job on Golf View, off Thompson Road, to the Smoke House for lunch. While White was en route to the Smoke House, a Bell telephone truck "pulled out on him" and ran a stop sign at the intersection of Dowling street and Golf View. He and his workers continued to watch the Bell truck as it pulled out onto Thompson Highway without stopping at the stop sign at Golf View and Thompson; they saw a dump truck approaching at around 40 miles per hour. The

Bell truck ran out into the path of the dump truck, and the dump truck hit its brakes, went into a skid, turned over, and went into a slide. The Bell truck stopped out in the street long enough for its occupants to see the other truck turn over, then went on its way. If the dump truck had not turned sharply, it would have "run dead over that telephone truck."

The jury was entitled to conclude from Mr. White's testimony that Gonzales was negligent and that David Sims was not. We overrule points four and five.

■■■ The appellants say in another point that the trial court erred in admitting, over objection, opinion testimony of Travis Clay and Bartow Watson concerning the potential net earnings of Roy Sims' business, because a proper foundation had not been laid. As a general rule, the question of whether a person is qualified to give opinion testimony in a given area is a matter within the judicial discretion of the trial court and will be overturned only for abuse. *Standard Motor Co. v. Blood*, 380 S.W.2d 651 (Tex.Civ.App.1964, writ dism'd); *Rhinetubes, Inc. v. Norddeutscher Lloyd*, 335 S.W.2d 269 (Tex.Civ.App.1960, writ ref'd n.r.e.); *Bolstad v. Egleson*, 326 S.W.2d 506 (Tex.Civ.App.1959, writ ref'd n.r.e.). Once a person is qualified as an expert he may give his opinion on any matter within the realm of his expertise, *Carr v. Radkey*, 393 S.W.2d 806 (Tex.1965), so long as the facts upon which his opinion is based either are within his personal knowledge or otherwise are properly in evidence, *Roth v. Law*, 579 S.W.2d 949 (Tex.Civ.App.1970, writ ref'd n.r.e.); *Jefferson Chemical Co., Inc. v. Forney Engineering Co.*, 466 S.W.2d 361 (Tex. Civ.App.1971, writ dism'd).

Travis Clay testified that he is the owner of Clay's Dirt Pit, which is open five or five-and-a-half days each week, that he has been in the hauling business for more than twenty years, that he is familiar with the hauling capacity of 1975 International 14–yard dump trucks like the one belonging to Roy Sims that David was driving. Bartow Watson testified that he has been involved in the dump truck and construction business since 1974, that he owns three dump trucks and leases ten more, that his trucks haul sand, fill dirt, and road material, that he is familiar with the productivity of the 1975 International 14–yard, 10–ton dump truck and currently owns other trucks of that size, and that he is familiar with the gross income per day from one of those trucks.

The appellants concede that the experts were qualified to testify to the potential net profits of a well-established hauling business but they do not agree that they could speak to the lost net profits of Roy Sims because 1) neither witness was personally familiar with Roy's business or earnings and 2) the other evidence adduced at trial was insufficient to establish the underlying facts. The primary contention is that the evidence did not show that Roy Sims' trucks were hauling regularly.

Clay testified that assuming a 1975 International 14–yard dump truck owned by a person who did his own mechanical work was hauling regularly during the summer of 1978, its general, average gross profit would be somewhere between $300 and $350 per day and its average net profit would be $200 per day; this would be true of most trucks in the hauling business. Wilson estimated that a 14–yard dump truck would earn a net profit of approximately $200–$225 per day.

■■■ Roy Sims testified that he got into the dirt hauling business in late 1977 or early 1978, that he traded in one of the two trucks he owned in April or May of 1978 on a 1975 10–ton, 14–yard International, that it was this truck which was involved in the accident in question, and that he did his own mechanical work on it. He said his gross receipts for March of 1978 were $12,-024, two-thirds of which were attributable to operation of the International truck. He operated his truck five-and-a-half to six days per week, regardless of the weather. In 1978 he could earn $350 with a truck on a given day depending on the number of loads he was able to make, and on his best day he grossed $500. The only factor which caused his business to vary was the weather, but he lost a few loads when he had to

do mechanical work on the truck which was not involved in the accident. He had an oral contract with Ambassador and Norwood Homes, and he would make as many loads in a day as he possibly could. His 1975 International was being run regularly during the month and a half before the accident. His records do not indicate how many hauls he made in a given month; they only show when payment was received for the work he did. We hold that the foregoing was sufficient to establish a foundation for expert testimony as to what net profit a truck like that of Roy Sims could make when hauling regularly, and we hold that it was being used regularly until stopped by the accident. We overrule points of error seven and eight.

The appellants assert that the jury's answers to Special Issues 15 and 18 were so against the great weight of the evidence as to be manifestly unjust. They do not complain about the answers to parts b and e of Issue 15, however.

In answer to Issue 15 the jury found that the fair and reasonable amount required to compensate David Sims for his injuries resulting from the accident was:

a) $7,490 for past loss of earning capacity;

b) $5,000 for past physical pain and mental anguish;

c) $20,000 for future physical pain and mental anguish;

d) $20,000 for loss of future earning capacity;

e) $1,092.70 for past medical and hospital expenses.

In answer to Issue 18 the jury awarded $12,000 to Roy Sims for his loss of net profits from his business resulting from the accident.

The primary challenge to the $12,000 award to Roy Sims is that it was based totally on the unsupported opinions of the appellees' expert witnesses and ignored the facts documented in Roy Sims' ledger. We have held that sufficient evidence was adduced to support the admission in evidence of the expert opinions of Clay and Watson.

Their estimates of the average daily gross profit that could be earned from a truck such as Roy Sims' 1975 International corroborated his testimony that his gross receipts were an average of $350 per pay. Sims explained that his ledger only reflected payments as he received them and did not show how much work he had performed in a given day or month. The jury was entitled to believe this. Roy Sims lost profits in his business from the day of the accident until his truck could be repaired approximately 100 days later, and on that basis he asked for $20,000 for lost net profits. The jury allowed $12,000, or $120 per day. This finding is not against the great weight of the evidence; point of error nine is overruled.

The jury awarded $7,490 to David Sims for loss of earning capacity since the accident. The appellants argue that the award is based solely on the appellee's testimony and is against the great weight of the evidence. David Sims testified that he was not able to return to work for approximately three months after his injury and that he then performed cleanup jobs with one hand from approximately August of 1978 until January of 1979, because he could not do regular work. At the time of the accident David Sims was 49 years old. He began working in the oil fields when he was 13, but he went to college "for a short spell." After losing seven of his fingers in an industrial accident in 1953, he worked for 16 years as a letter carrier, but he often had odd jobs, in addition. He was also hurt in a number of other accidents.

When his truck turned over in this accident, he was pinned inside for some time. After the accident he was taken to the hospital in an ambulance. He was in lots of pain, mostly in his left wrist, but also one foot and leg. He stayed in the hospital nearly four days. A splint was put on his wrist. He still has trouble with his left foot; it sometimes causes him to lose his balance and almost fall. Since the accident he sometimes has a nagging pain in his neck, one that makes it hard for him to sleep. He has lost a considerable amount of mobility in his left wrist.

Dr. Donald Baxter, who treated David after the accident but who has not seen him since about a month after that, testified that David Sims sustained a wrist fracture in the accident and that his records indicate that Sims could return to work three weeks after June 15th. Dr. Alvin Lewis, the family doctor, testified that David Sims would have mild to moderate chronic discomfort of a progressive nature to his wrist and that arthritic symptoms tend to persist and often increase in severity, leading to further demineralization of some of the bones and causing greater joint symptoms in persons of David's age and activities. "There is a great likelihood that he could have mild to moderate discomfort possibly of a progressive nature related with pain in his left wrist and possibly neck."

In January of 1979 the appellee went to work for Brown and Root at $7.50 or $7.60 per hour. Manuel Davila, who had known and worked with David Sims for more than fifteen years, testified that David could not do the work and eventually was told by his co-workers to "get out of the way and stay in the truck." Davila stated that before he was hurt in this accident, David was a hard worker who did his share and that there was no comparison between his abilities before and after the injury. When David left Brown and Root he went to work as a security guard for Burns at approximately $3.50 per hour and at the time of trial was earning approximately $4.29 per hour.

▉ The plaintiff has the burden of proving his loss of past earning capacity. The amount of his damages must only be established with the degree of certainty to which it is susceptible. *See Bailey v. Merrill*, 582 S.W.2d 489 (Tex.Civ.App.1979, writ ref'd n.r.e.). However, the jury should not be left to mere conjecture where facts appear to be available upon which the jury could base an intelligent answer. *Bonney v. San Antonio Transit Co.*, 160 Tex. 11, 325 S.W.2d 117 (1959). Where the plaintiff seeks special damages for loss of earning capacity in a particular business, the amount of his earnings or the value of his services in that business must be shown

with reasonable certainty. If the plaintiff's earning capacity is not totally destroyed but only impaired, the extent of his loss can best be shown by comparing his actual earnings before and after his injury. *McIver v. Gloria*, 140 Tex. 566, 169 S.W.2d 710 (1943). Specific proof of actual earnings and income are *evidentiary* of the ultimate issue, and the true measure of damages is the diminished earning power of the plaintiff directly resulting from the injuries he sustained in the accident. (emphasis added) *Dallas Railway & Terminal Co. v. Guthrie*, 146 Tex. 585, 210 S.W.2d 550 (1948); *Greyhound Lines Inc. v. Craig*, 430 S.W.2d 573 (Tex.Civ.App.1968, writ ref'd n.r.e.).

▉ The fact that an injured party may work and earn as much or more than he did before he was injured does not bar him from recovering for loss of earning capacity. *Mikell v. LaBeth*, 344 S.W.2d 702 (Tex.Civ.App.1961, writ ref. n.r.e.).

▉ David testified that before the accident he made money on the side by cleaning up around construction jobs and, in addition, his gross weekly pay from driving his brother's truck was $250 and his net was $200; on cross-examination, however, he testified that he was being paid an average of $70 to $75 per day by his brother when the accident happened. All this was evidence of his earning power before the accident, but the jury was entitled to conclude, from it and from evidence that he began to earn $300 per week some 31 weeks later, that before the accident his capacity to earn was as much as $300 per week.

Some 97 weeks elapsed between the accident and the trial. The job that paid $300 per week beginning 31 weeks after the accident was the one with Brown & Root that we have mentioned. David testified that he held onto that job for 30 weeks, then he went to work for Burns Security Company. At Burns his weekly pay was $182 for some 25 weeks, then about $200 per week for 9 weeks. The jury was entitled to accept the testimony of David Sims and Manuel Davila that David was physically unable, by reason of the injuries he received in this accident, to perform his duties on the Brown & Root

job. The proof showed, however, that he was able to handle his work as a guard for Burns Security Co., so the jury may properly have decided that his earning capacity during the combined time span of those two jobs, 66 weeks, equalled the amount he received from Burns.

If his weekly earning capacity was $300 before the accident and $182 for a 55–week interval later on (30 weeks for Brown & Root and 25 weeks for Burns Security Company), his loss during that interval amounted to $6,490; add $900 for the 9 weeks when his weekly wage was $200 (a loss of $100 per week), and the total loss is $7,390. David testified that he could not work at all during the first 13 weeks after the accident; if his earning capacity was then $300 per week, that amounted to $3,900, and the total is now $11,290. At the end of that initial 13–week period there was an interval of about 18 weeks before David went to work for Brown & Root. He testified that at the start of that 18–week period, around August 10, 1978, he tried for a short time to resume his work of salvaging materials around construction jobs. He tried hard to work so he could pay his note and wouldn't lose two trucks, his tractor, and his wife's car, but he couldn't do the work because of the injuries he received in the accident. He was unable to testify how much money he made during those 18 weeks, but at best it was very little. Even if the jurors did not allow David any loss of earning capacity during that 18–week period, we have shown that they were entitled to conclude (based on the computations above) that his past loss amounted to $3,800 more than the jury's finding.

■ The appellants next complain about the finding that David's loss of earning capacity in the future would amount to $20,000. David was 48 years old in 1978. A life insurance table was introduced in evidence showing that a man of David's age, 48, had a life expectancy of 26 years. The jury was entitled to conclude from the evidence that the earnings of David Sims would remain about the same, and if he did continue to suffer a $100 decrease in weekly wage earning capacity for only four years after the trial in 1980, his loss would amount to $20,800.

■ The appellants also say that the jury's award of $20,000 for David's future pain and mental anguish is not supported by the evidence. We have noticed the testimony of Dr. Lewis and of David Sims as to his pain and discomfort. Since David has seven fingers missing, it was reasonable to the jury to consider that future pain or discomfort in his wrist would heighten his anguish over whether he will be able to work and earn a living for his wife and children. He will probably have to work for others now that he has lost both of his trucks, his tractor and front-end loader. There is evidence that David still feels pain in his left wrist and in his back. It is well settled that matters of pain and anguish are peculiarly within the discretion of the jury.

We overrule the appellants' tenth point.

■ The appellants have also raised a point of error asserting that the trial court erred in refusing to grant a continuance when it was discovered during the course of trial that Roy Sims had earlier failed to produce for the appellants' inspection a number of receipts and records related to his business operation. "[T]he trial court's denial of a motion for continuance is within the sound discretion of the trial court and it will be presumed, absent a showing of an abuse of discretion, that the court properly exercised its discretion." *Southwestern Bell Telephone Co. v. Griffith*, 575 S.W.2d 92, 97 (Tex.Civ.App.1978, writ ref'd n.r.e.). Rule 215a, Tex.R.Civ.P., provides, in pertinent part, that if a "party . . . refuses to comply with a subpoena duces tecum . . . either party may apply to the court . . . for an order directing compliance .. . . . If the motion is granted and if the court finds that the refusal was without substantial justification the court may . . . make such orders in regard to the refusal as are just, and among others, those permitted by Rule 170."

Roy Sims says the documents in question were made available to the appellants at

the taking of the deposition, but that the appellants did not take the opportunity to copy them. No abuse of discretion has been shown in denying the oral motion for continuance, which was made during the course of trial. See Rule 251, Tex.R.Civ.P.

■ Finally, the appellants argue that it was error for the trial court to refuse to excuse juror Pablo V. Torres from the jury panel since, they say, Mr. Torres informed the court that he had substantial doubts about his ability to render a fair and impartial verdict based solely on the evidence adduced at trial. The voir dire examination of the jury panel was not reported; an implied finding that a prospective juror is not biased or prejudiced will not be disturbed on appeal absent a showing of abuse of discretion. *Ratcliff v. Bruce*, 423 S.W.2d 614 (Tex.Civ.App.1968, writ ref'd n.r.e.). The record reflects that counsel for the appellants told the court that Mr. Torres had indicated that he

> had a very serious problem going forward with this case because of the fact that he had been involved, as I recall, in a worker's compensation type case or injury on the job and it seemed to him to indicate that he was not at all satisfied with the resolution of it in his case. . . .

■ The appellants' counsel took the position that they did not get the regular jurors to strike because Mr. Torres should have been excused for cause. The trial court found that Torres had been questioned at length before the bench and that his answer was that he could serve as a fair and impartial juror. We cannot say from the record before us that Torres was disqualified as a juror or that an abuse of discretion was shown. Moreover, the appellants failed to demonstrate that they had used all of their peremptory challenges and were therefore prejudiced. *See Southwestern Public Service Co. v. Morris*, 380 S.W.2d 648 (Tex.Civ.App.1964, no writ).

The trial court's judgment is affirmed.

Chief Justice COLEMAN, C.J., and SMITH, J., participated.