**M. Neal GUENTZEL, Appellant,**

v.

**TOYOTA MOTOR CORPORATION, et al., Appellees.**

**No. 04-87-00290-CV.**

Court of Appeals of Texas, San Antonio.

March 31, 1989.

Rehearing Denied May 1, 1989.

James Warncke, Branton, Warncke, Hall & Gonzales, San Antonio, for appellant.

Lewin Plunkett, Harry S. Bates, Plunkett, Gibson & Allen, San Antonio, for appellees.

Before CADENA, C.J., and REEVES and CHAPA, JJ.

## OPINION

REEVES, Justice.

M. Neal Guentzel, individually and as next friend of his minor children, sued Toyota Motor Corporation and Toyota Motor Sales, U.S.A., Inc. for personal injuries suffered in an automobile accident. In the accident Mrs. Guentzel was killed and three children were seriously injured. One child, Neal Andrew, was rendered a paraplegic.

Guentzel, hereinafter referred to as appellant, alleges the lap belt restraint system in the rear seat of the family's 1982 two-door Toyota Tercel was defectively and negligently designed. According to appellant, this defect allowed the children to "submarine"[1] under the lap belts, thereby causing the severity of the injuries. The jury failed to find the seat belt restraint system defectively or negligently designed and appellant now appeals to this court. We reverse the trial court's decision, and remand for a new trial.

Appellant contends the trial court erred in:

---

1. "Submarining" describes the process whereby the buttocks move down and forward under a lap belt as the lap belt rises above the pelvis and iliac crest.

1. failing to grant a new trial because the refusal of the jury to find the seat belt system in the Toyota was defectively designed is against the great weight and preponderance of the evidence;

2. failing to grant a new trial because the refusal of the jury to find the seat belt system in the Toyota was negligently designed is against the great weight and preponderance of the evidence;

3. in excluding the testimony of a medical doctor that had the seat belt remained upon the pelvis above the iliac crest the doctor would not have expected the abdominal injuries received by Neal Andrew Guentzel to occur.

### The Accident

On March 7, 1985, at about 7:00 p.m., Martha Guentzel was driving her 1982 two-door Toyota Tercel on a highway near the San Antonio International Airport. The Guentzel children—Neal, Amy, and Gary— were seated in the backseat. The children were wearing lapbelts. As Mrs. Guentzel was proceeding in a southerly direction, a 1984 Mercury Marquis, traveling in a northerly direction, crossed the median between the lanes and collided head-on with the Toyota.

Mrs. Guentzel was killed instantly. Amy suffered severe abdominal injuries which resulted in a colostomy, which was later surgically reversed. Neal suffered abdominal injuries, a dislocated fracture at the L4–5 lumbar, and a stretch injury of the spinal cord which resulted in paraplegia at the T4 level. Gary had a fracture of the right iliac crest.

### Controlling Factual Issue

■ The appellant urges and appellee acquiesces that "this case turns upon whether or not the lap belts remained upon the pelvis and beneath the iliac crest." If a lap belt rises above the iliac crest, then Federal Motor Vehicle Safety Standard 209 has been violated. In relevant part, this standard (Title 49, Chapter 5, National Highway Traffic Safety Administration, section 571.209, subsection S4.1, point b) states, "A seat belt assembly shall provide pelvic re-straint whether or not upper torso restraint is provided, and the pelvic restraint shall be designed to remain on the pelvis under all conditions, including collision or roll-over of the motor vehicle." Experts for both appellant and appellee agree that if a seat belt comes up over the iliac crest, it is no longer on the pelvic girdle and is in violation of the federal standard. Whether or not the children submarined was a question of fact to be decided by the jury.

### Appellate Review

Appellant's first two points of error deal with the sufficiency of the evidence. When reviewing a jury verdict to determine the factual sufficiency of the evidence, the court of appeals must (1) consider all the evidence and (2) weigh all the evidence. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986); *Cain v. Bain*, 709 S.W.2d 175 (Tex.1986). Some have alleged this procedure means the reviewing court engages in "thought processes" akin to that undertaken by a jury. *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex.1988).

To a limited extent this is true. This Court has studied the same exhibits shown to the jury. We have read the testimony given by each witness. This Court must sustain the jury verdict unless it is contrary to the "overwhelming weight" of the evidence. *Cain v. Bain*, 709 S.W.2d at 176. An appellate court cannot merely substitute its judgment for that of the jury. *Cropper v. Caterpillar*, 754 S.W.2d at 651.

### The Injuries

Appellant contends the seat belt system in the Toyota was defectively and negligently designed and this defect caused the children's injuries. He theorizes that, upon impact, the seat belts slipped off each child's pelvis, rose above the iliac crest and landed upon the soft tissue of the abdomen above the navel. With the seat belt so located, blunt trauma occurred to the internal organs. The appellee contends the seat belts did the task for which they were designed and had it not been for the seat belts, the injuries would have been far

worse because it was such a horrible wreck.

To simply say the intensity of the collision caused the injuries does not suffice as an explanation. When a motor vehicle moves forward at a certain rate of speed, the human body inside is traveling at that same rate. When a collision occurs, the vehicle stops suddenly, but the body inside still tends to forward movement, at least for a second or so. The body then slams backward and this sudden backward movement again gives rise to another forward movement until the body comes to rest.

If a seatbelt has slipped and is acting as a restraint upon soft tissue, as appellant contends, blunt trauma or decelerative injury results. If the seatbelt remains against the bony surface of the pelvis, as appellee argues, the severity of any resulting injury will depend on the initial intensity of the collision.

For example, Amy suffered severe injury to her mesentery. The mesentery is an internal membrane which holds the small intestine, principally the ileum and jejunum. This membrane connects these parts of the small intestine to the dorsal wall of the abdominal cavity. It also serves to retain the intestines in position and conveys to them connecting blood vessels and nerves. With Amy, an avulsion occurred. The jejunum, ileum and sigmoid colon—all heavier than the mesentery—tore away from the mesentery. Because blood supply was interrupted, surgeons had to remove 10 centimeters of jejunum and 120 centimeters of ileum. To allow the intestine time and opportunity to heal, Amy had a colostomy, which was later reversed.

Neal suffered similar abdominal injuries but his colostomy is irreversible. In addition, upon impact, Neal's upper body apparently arched over the seatbelt at the waistline. The spinal cord, stretched beyond its capacity, snapped at approximately the T4 level. This caused paralysis from that point down. Appellant contends that the seatbelt acted as a fulcrum and Neal's body "jack-knifed" because the soft abdomen allowed much more play than would have the pelvis. Additionally, Neal had to undergo a fusion at the L4–5 lumbar spine due to a fracture.

Gary's appreciable injury was a fracture of the right iliac crest. Appellant contends this proves the seatbelt moved above the navel. Appellee is just as positive the fracture shows proper placement of the seatbelt as the fracture would not have occurred unless it stayed in place.

### The Testimony

### The Emergency Medical Technicians

The most profound area of disagreement centered around the locations of bruises and/or abrasions on the children's bodies. If these markings were above the navel, this would be a solid indicator that submarining did occur; if below the navel, essentially the seat belts did their job.

At trial, a significant portion of the testimony concerned locations upon and injury within the abdomen. As a general rule, physicians and medical personnel divide the abdomen into four quadrants, with the navel in the center. "Lower abdomen" would indicate below the navel.

Right upper quadrant — Left upper quadrant

Right lower quadrant — Left lower quadrant

The first people immediately on the scene of the accident who could describe the children's conditions were the emergency medical technicians (EMT). Bruce Schwall, who was involved with Neal's care, testified that he saw a "discoloration" across Neal's lower abdomen. When Neal's pants were removed, Schwall said he observed "rope-burn" red abrasions about an inch or two below the navel. As to Amy, the EMT said he noted abdominal abrasions below the navel.

EMT Leo Corolla worked with Gary and he testified Gary had abrasions right below the navel. There was also testimony from Corolla's earlier deposition that Gary complained of pain in his lower abdomen, at the vicinity of the navel. A third EMT, Rudolf Puzon, testified that Amy also complained of abdominal pain. Puzon also testified that the bruises on Neal were below the navel.

Henry Valadez, a television cameraman, was also on the scene. He told the jury he saw bruise marks on the little boy in the ambulance (Gary) and the markings were above the stomach.

### At the Hospital

Shortly after the children were taken to the hospital, a neighbor of the Guentzels, Cheryl Kelley, arrived to help. She testified she sat with each child, in turn, when appellant was caring for another child. She told the jury she observed "rope marks," across the navel, on all three children. Appellant also testified he saw abrasions, across the navel, on Gary.

### Dr. Arthur McFee

Dr. McFee performed the initial abdominal surgery on Neal to treat the immediate life-threatening injuries. However, he did not see any evidence of seatbelt abrasions because Neal was already draped and prepped for surgery. He did testify that the hospital records showed Neal to have had seatbelt abrasions over his lower abdomen. As to Neal's injuries, the doctor said the conditions he found, in Neal, during surgery, led him to believe that some kind of force had been exerted upon Neal's abdomen and that the junction of the recto-

sigmoid "exploded." The doctor continued, "I think he had to have motion forward to be suddenly restrained, and I think in this case, the only thing that could suddenly have restrained him was the seatbelt because I think that was the only thing that he hit."

In reference to Amy's injury, Dr. McFee was asked if an injury to the jejunum would be above the navel. He replied that generally the jejunum would be in the left upper quadrant of the abdomen and the ileum would be in the right lower quadrant. The doctor described the abdominal injuries as decelerative in nature and that it could happen when a seatbelt is loose or had slipped. He also noted that the injuries did not indicate the exact position of the seatbelt on either Neal or Amy. It was his opinion that a properly fitted and tightened seatbelt should not pass over the soft abdominal tissue but should fit snugly over the pubic bone.

### Dr. Willis Brown

Dr. Brown treated Neal for his lumbar spinal injury and performed the spinal fusion. He testified that Neal's seatbelt probably served as a restraining force and as a fulcrum. His opinion was that Neal doubled up over the seatbelt and "just stretched and overstretched and what couldn't stretch further was the spinal cord." This doctor also testified that the hospital records, for Neal, indicated a seatbelt abrasion over the lower abdomen.

### The Experts

Both sides called upon a biomechanical engineer to explain to the jury how the collision caused the children's injuries. At trial biomechanics was defined as "a marriage between medicine and engineering" in that injury is a purely mechanical process up to the instant it occurs. Once an injury occurs, then it is purely medical. The understanding of how forces act on the human body in order to create injury is mechanical as the injury is the result of a greater force being applied to the body than it was designed to withstand.

Testimony established that both engineers studied the wrecked Toyota, the doctors' reports, the X-rays, and other pertinent data. Both also based their opinions on numerous past studies of statistics, case histories, experiments, and other information in this specialization. Both cited authorities other than themselves. Both experts agreed that if a seatbelt rises above the iliac crest, during a collision, the seatbelt has failed to meet the federal standard.

### Appellant's Expert

Dr. Donald Van Kirk testified that, in his opinion, the three children submarined. He said the Toyota restraint system was "insufficiently" designed. Gary, who sat on the right side of the back seat, was injured because his seat belt possessed a different angle on each side of his body. The angle of the belt on the right side was close to vertical while the left side was more horizontal. Gary submarined because the accident occurred on the left front corner of the Toyota and he was projected in that direction. As he began his forward movement, the belt stayed down on the right side but the left side began to rise because of its shallow angle. Then as Gary's body neared the end of the impact sequence, the right portion of the belt came on up and fractured the very top part of the iliac crest as it slipped into the softer abdomen.

Amy was on the left side of the backseat. Because the impact of the collision was to the left, her trajectory was to the left. The left side of her seatbelt had a sharp, vertical angle and the right side was more horizontal. As she was behind the direct hit, her belt, already higher on the right side, moved more quickly and compressed her abdomen with more force, thereby causing more severe injuries.

Dr. Van Kirk said the Toyota belts were specified to have a 45 degree angle for the inner section of belt and 70 degree angles for each outside belt. However, it was his belief that this particular model vehicle's inner belts sat at a 35 to 38 degree angle.

Neal, seated in the center, had two inside belts at the inadequate angle. He suffered

the most severe injuries because both his belts had the most horizontal angle. He went underneath the belt almost immediately as he began also to stretch forward. His body continued to rotate forward and he consequently jack-knifed as well.

Dr. Van Kirk also was highly critical of the Toyota's back seat cushion and the seat pan. He said the seat cushion had inadequate support. The seat pan was not built up in front and was literally horizontal from the rear section of the vehicle to the front. As a result, when the children's bodies were sinking into the seat on the backward stroke of the trajectory, there was insufficient support to help the body recoil. Further, there is insufficient support to absorb the shock of the collision.

### Appellees' Expert

Dr. Verne Roberts, testifying for the appellees, did not agree with Dr. Van Kirk. It was Dr. Robert's position that the severity of the wreck was responsible for the severity of the injuries. He said that seat belts are designed (1) to slow down the body's speed as the car's speed slowed and (2) to prevent the body from striking any object in front of the body. Basing his opinion on the reported speeds of the Toyota and the Mercury, he categorized the collision as the kind where someone was bound to be seriously injured, if not killed.

According to Dr. Roberts, Gary's fracture proved the belt was properly positioned in that the belt was holding so tightly and the force was so great that the belt did press in on the pelvic bone. Neal was also held properly in place but the tremendous force of inertia on the upper torso pulled to the extent that the spinal cord snapped. Dr. Roberts said Neal's predominate injury was a tensile failure of the spine itself. Amy's injuries occurred because of deceleration. The bruises and abrasions on the lower abdomen were caused by the violent contact of the body and the belt and showed that the belt was in place. According to Dr. Roberts, had the children submarined and had the upper abdomen been compressed, the injuries would entail fractured livers and spleens and ruptures to the stomach. As it was, the injuries were primarily to the mesentery and intestines, which were behind the seatbelt.

### Three-Point System

Appellant also charged that Toyota's design was defective and negligent because the back seat did not have shoulder harnesses with the seat belts. The Toyota was equipped with anchor locations for the harnesses but Toyota made no effort to inform the customer that a harness could be installed. The argument is that a shoulder harness will prevent jack-knifing, as happened to Neal, because a three point system better distributes the force through a wider area of the body and holds the body more firmly in place.

Appellee, in turn, pointed out that the three point system has its own set of problems because of its proximity to the neck. Dr. Roberts referred to a publication authorized by the National Highway Traffic Safety Administration of the Department of Transportation. This report cautions parents that a lap-shoulder automatic belt is designed to protect adults. Children should be placed in the back seat and should use a seatbelt.

### The Exhibits

The exhibits presented to the jury included (1) actual film footage shot at the scene of the accident; (2) individual photographs lifted from that film; and (3) portions of hospital records. These hospital records included what are sometimes referred to a "little man" figure which is a scaled outline of the human body. Emergency room personnel and other medical staff mark these outlines to show the actual areas of injury.

Appellant alleges the film showed definite seatbelt abrasions on Neal and Gary that were above the navel. Dr. Van Kirk testified he had viewed the film and the photographs and he was of the opinion the markings were above the navel. Dr. Roberts disagreed.

The "little man" drawings and the written hospital reports on all three children refer to "bruises," "abrasions," "lapbelt

injury" on the lower abdomen. Some markings were made on or across the navel.

### Conclusion

Where there is conflicting evidence, it is the jury's task to resolve any conflict or inconsistencies in the evidence. *Pool v. Ford Motor Co.*, 715 S.W.2d at 634. This Court cannot set aside a verdict because it might, upon examination of the evidence, have arrived at a result different from that attained by the jury. *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex.1988), citing *Branch v. Dever*, 18 Tex. 612 (1857). We are of the opinion that the evidence in the record is sufficient to support the jury's verdict. Appellant's first two points are overruled.

### Exclusion of Testimony

■ In response to appellee's pre-trial objection, the trial court ruled that Dr. McFee did not qualify as an expert witness who could give an opinion on the extent of Neal's injuries had the seat belt remained in place upon the pelvis.

Before our discussion on this point, we will first deal with appellee's contention that this point is not properly before this court. Appellee contends that although a bill of exception was made, the evidence was never offered and no ruling from the court obtained. The transcript shows that, before trial, appellee filed with the court objections to videotaped deposition testimony from Dr. McFee. Appellee's objections contended Dr. McFee is not qualified to testify in the field of biomechanics and injury causation. There is no formal ruling in the transcript. However, there does appear directly upon the filed objections a notation, presumably in the trial judge's handwriting, that show appellee's objections were sustained in regard to the excluded testimony. Furthermore, the handwritten notations are initialed, presumably by the trial judge. By bill of exception appellant developed the proffered testimony. This point has been preserved for our review. TEX.R.APP.P. 52.

Expert testimony is governed by TEX.R. CIV.EVID. 702:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Under this rule, expert opinions are admitted in evidence on the theory that the expert, by reason of study, has special knowledge which jurors do not possess and is therefore better able to draw conclusions from facts. *Seale v. Winn Exploration Co., Inc.*, 732 S.W.2d 667, 669 (Tex.App.— Corpus Christi 1987, writ denied). An expert evaluates facts and his evaluation must meet three prerequisites:

1. A body of scientific, technical, or other specialized knowledge must exist that is pertinent to the facts in issue;
2. The witness must have sufficient experiential capacity in his field of expertise. This capacity encompasses knowledge, skill, experience, training, and education;
3. The facts evaluated must be within the witness' field of specialized knowledge.

*See Texas Rules of Evidence Handbook*, 20 HOUS.L.REV. 458. *See also* R. Ray, LAW OF EVIDENCE, 2 TEXAS PRACTICE § 1400 *et. seq.* (Supp.1986).

■ Generally, the question of whether a person is an expert witness is a discretionary matter left to the trial judge. *Southwestern Bell Telephone Co. v. Sims*, 615 S.W.2d 858, 862 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ); *Columbia Engineering Int'l, Ltd. v. Doorman*, 602 S.W.2d 72, 77 (Tex.Civ.App.—Beaumont 1980, writ ref'd n.r.e.).

For Dr. McFee's opinion, there exists a body of specialized medicine pertinent to the facts in issue. It is often termed "emergency medicine," "trauma control," or by some other like designation. It is clear from testimony that Dr. McFee is no stranger to an emergency room or emergency surgery. Additionally, Dr. McFee testified he is a surgeon and a professor of

surgery with extensive experience in abdominal surgery, including the gastrointestinal tract. The doctor's credentials demonstrate his knowledge, education, training, skill and experience. Dr. McFee testified he has addressed the topic of lap belts and injury in emergency medical texts he has authored. He testified intelligently and fluently about seat belts generally and their positioning on the human body specifically. His testimony is not only replete with theoretical and actual knowledge concerning injuries like those suffered by Neal Guentzel, but he also catalogued the various manners and means by which these injuries arise. With it established that Dr. McFee is (1) an experienced surgeon, (2) knowledgeable about lap belts, (3) who has written about lap belts in the context of emergency medicine, and (4) who actually saw Neal's injuries, we next consider the pertinent part of the excluded testimony:

Q. (By Mr. Warncke): All right. And, doctor, would you expect to see these abdominal injuries that Neal had if the seat belt at all times during this collision had remained down low over the pelvis area and below the iliac crest?

MR. PLUNKETT: Objection.

Q. (By Mr. Warneke): Or are you able to give an answer to that?

A. I really probably should say no, but I think think that if he had been totally restrained and had not moved up against something that he hit as an arresting force, you probably wouldn't have seen much in the way of injuries.

Somewhere along the line, he was moving forward and hit an arresting force. It couldn't have been the dashboard. It couldn't have been the steering wheel. There was the seat in front of him and I don't know how well padded those are, but he did have a seat belt on and these are the kinds of injuries you sometimes see when someone comes forward and stops like that suddenly.

What I expect that the seat belt will do, indeed what it's supposed to do is to keep someone so that he doesn't do that, move independently. He moves totally within the seat.

Q. Doctor, if in addition to just a lap belt the seat belt had also had a shoulder harness, would that minimize force imparted by the lap belt to the body?

A. I think it would have been less on any one point.

Q. Including the area of the lap belt?

A. I am no expert on over-the-shoulder belts in the rear of cars. In fact, I don't think I have ever seen one, but I think it would have done that and I think that's why probably it was designed initially.

Q. All right. Now what you are saying, I understand, is you are not a biomechanical engineer?

A. No. —

Q. (By Mr. Warncke): Now, if the seat belt had of remained below the iliac crest across the pelvic girdle, if it had been there and remained there throughout the mechanism of this accident—

A. I think it would have done what it's supposed to do; restrained his entire pelvis and nothing would have moved and the force would have been dissipated into the seat rather than on him through the belt.

Q. And then is that—by your answer, are you saying that you would not expect to see these abdominal injuries.

A. I would be surprised.

MR. PLUNKETT: Objection to leading. Lack of predicate—

QUESTIONS BY MR. PLUNKETT:

Q. Doctor, isn't it true that—well, first of all, you are not an expert in biomechanics?

A. Absolutely not.

Q. And you are not telling us that you are able to say where the seat belt was at the time of Neal's injury or Amy's injury?

A. That would be the last think in the world I would try to do.

This same question, though in different form, was also asked of two biomechanical engineers. Appellee insists Dr. McFee's answer must be excluded because he is not a biomechanical engineer. By the same

token, appellee's biomechanical engineer is not a physician and surgeon.

As pointed out before, testimony established that, months after the accident, both engineers studied the wrecked car, the doctors' reports, the X-rays and other pertinent data. Then they testified in court as to their opinions on the cause of the injuries. Both also based their opinions on numerous past studies of statistics, case histories, experiments and other like data in the field. Both cited authorities other than themselves. In other words, the engineers possess an extensive data base dealing with injury and cause. It is clear that their testimony could assist the jury.

Admittedly Dr. McFee's technical database is not so extensive. However, he has an edge not possessed by the engineers. Just a few hours after the accident, Dr. McFee actually saw Neal Guentzel on an operating table, with his abdomen open and the damage in plain view. Essentially then, we have a situation where a biomechanical engineer, who is not a doctor, can testify as to the cause of injuries and a medical doctor, with experience with lap belt injuries, cannot. Not only is this not logical, but it is also not within the framework of the expert witness rule. As the engineer could assist the jury with the technical viewpoint, so could Dr. McFee, with the medical viewpoint. In a case of this nature, the jury should have been presented with both.

Appellee also insists that Dr. McFee's testimony would be speculative or conjectural. In *Lenger v. Physician's General Hospital, Inc.*, 455 S.W.2d 703, 707 (Tex. 1970), the plaintiff's colon had been resectioned but the procedure reversed and separated. The physician stated he did not know what had caused the problem. At that point the trial court sustained defendant's objection and refused to allow the witness to testify concerning the possible causes of the separation. The Supreme Court held this was error and stated, "Expert testimony concerning the possible causes of the condition in question will often assist the trier of fact in evaluating other evidence in the case." *Id. Cf.*

*Thrailkill v. Montgomery Ward and Co.*, 670 S.W.2d 382 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). (possibility of future surgery); *Hughett v. Dwyre*, 624 S.W.2d 401 (Tex.App.—Amarillo 1981, writ ref'd n.r.e.) (possible medical expenses).

In view of Dr. McFee's experience with lap belts and his experience with abdominal surgery, the trial court abused its discretion in excluding this portion of the doctor's testimony.

■ With error established we must determine if it is reversible error. Reversible error does not usually occur in connection with rulings on questions of evidence unless the whole case turns on the particular evidence admitted or excluded. *Atlantic Mutual Insurance Co. V. Middleman*, 661 S.W.2d 182, 185 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.). TEX.R.APP.P. 81(b)(1) provides in pertinent part:

No judgment shall be reversed on appeal and a new trial ordered in any cause on the ground that the trial court has committed an error of law in the court of the trial unless the appellate court shall be of the opinion that the error complained of amounted to such a denial of the rights of the appellant as was reasonably calculated to cause and probably did cause rendition of an improper judgment in the case, or was such as probably prevented the appellant from making a proper presentation of the case to the appellate court—

The Texas Supreme Court thoroughly discussed the harmless error rule in *Lorusso v. Members Mutual Insurance Co.*, 603 S.W.2d 818, 820 (Tex.1980), which this Court followed in *Nix v. H.R. Management Co.*, 733 S.W.2d 573 (Tex.App.—San Antonio 1987, writ ref'd n.r.e.). The *Lorusso* case recognizes the impossibility of prescribing a specific test for determining when trial court error "was reasonably calculated to cause and probably did cause rendition of an improper judgment—." The Court stated, "[s]uch a determination is a judgment call trusted to the sound discretion and good sense of the reviewing court—such a judgment call must be determined from an evaluation of the whole

case." *Id.* at 821. The party seeking reversible error must establish that the trial was "materially unfair." *Id.* at 820. In determining what is materially unfair, the Court quoted from *Patterson Dental v. Dunn,* 592 S.W.2d 914 (Tex.1979), which stated, "When the trial is contested, the error results in a materially unfair trial without showing more."

■ This case was strongly contested and the excluded evidence was pivotal as to appellee's liability. The material question was the defective or negligent design of the safety belts. Two biomechanical experts testified; one testified the safety belts were defectively designed, and the other that they were not. The Federal Motor Vehicle Safety Standard referred to earlier in this opinion mandated that the safety belt "shall be designed to remain on the pelvis under all conditions—." Although Dr. McFee was not a biomechanical engineer his experience in handling similar cases, including authoring articles about lap belts injuries, certainly qualified him to give his opinion whether he would expect to see the same type of abdominal injuries that Neal suffered had the belt remained down low over the pelvis area and below the iliac crest. The exclusion of the testimony is reversible error.

The judgment of the trial court is reversed and the cause is remanded for another trial.