**CITY OF HOUSTON and Ulysses Ford, Appellants,**

v.

**F. Richard LEACH, Appellee.**

No. A14–90–00013–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 26, 1991.

Mark Thompson, Houston, for appellants.

M.H. Cersonsky, Houston, for appellee.

Before JUNELL, MURPHY and CANNON, JJ.

## OPINION

CANNON, Justice.

Richard Leach is a self-confessed whistleblower. He contends, and the jury agreed, that he was fired from his job with the City of Houston's Solid Waste Management Department in violation of the "Texas Whistleblower Act" and the first amendment because he in good faith reported a violation of law to an appropriate law enforcement authority. The city and its Director of Solid Waste Management, Ulysses Ford, appeal from the jury's verdict and bring seven points of error complaining of the sufficiency of the evidence, the admission of certain evidence, and error in the charge. We affirm.

In January 1986, after six and a half years of distinguished service in the City of Houston's Public Works and Purchasing Departments, Leach accepted a position with the city's Solid Waste Management Department (the Department). When Leach joined the Department, Charles Ware was its director. Ware left the Department a year later and was replaced by Ulysses Ford in March 1987. As Administrative Assistant III, Leach reviewed purchasing and accounting documents before the director signed them, wrote correspondence for the director, managed the capital

improvement plan for the Department, conducted investigations and wrote reports on behalf of the Department, and worked on special projects assigned to him by the director. During his tenure, Leach conducted several investigations or audits of Department operations. Leach contends that his discharge in September 1987, was a result of those activities. The following are the activities that Leach contends led to his discharge.

### The Heil Contract

In a report to Ware, dated February 21, 1986, Leach concluded that approximately 22% of the items purchased under invoices representing 20% of the total value of the contract were non-contract items. Leach found that a city supplier was using non-contract parts to fabricate new truck cylinders or to rebuild old truck cylinders. The supplier provided the cylinders to the city at a set fee. The value of these purchases was $30,644.84. The estimated value of these purchases based on the total value of the contract was approximately $154,000.00. Leach made several recommendations to "legitimize" the purchase of these non-contract items through use of emergency purchase orders, through renegotiation with the supplier, or through a new contract established through the formal bid process.

### The Pak–Mor Contract

In a report to Ware, dated June 9, 1986, Leach found that a city contractor, charged above the contract price for truck replacement parts and labor 22% of the time. The overcharges cost the city $1746.22. In 39% of its purchases under the contract, the Department did not know if it was overcharged by the contractor since the replacement parts were not on the manufacturer's published price list and labor was charged as a lump sum. Thus, in a total of 61% of its purchases under the contract, the Department was either overcharged or did not know if it was overcharged. Because the contractor refused to explain the overcharges or to provide the manufacturer's price list, Leach recommended that the matter be referred to the city Legal Department to pursue both civil and criminal actions. A copy of both the Heil and Pak–Mor reports were given to the new director, Ford, on May 5, 1987.

### Collection Crews

In a report to Ware, dated August 6, 1986, Leach found that different collection crews demanded money and beverages from customers as a fee for extra garbage pick-up. At two neighboring locations, a crew received $15.00 every collection day for two years and seven months. At another location, a crew received a six-pack of beer every week for twenty-three years. At a fourth location, a crew received beer, sodas and/or ice every service day for twenty five years.

### Astro Reflections

In December 1986, Leach found that a Department employee, Dr. Pam Cooper, operated a computer horoscope business called "Astro Reflections," on city time, using city employees and equipment. Since Leach alleged that Ware was involved in the business, he reported his findings to Clarence West in the mayor's office. West contacted City Attorney, Jerry Smith, who set up a meeting between Leach and the district attorney's office. After Leach turned over documents from the business, the district attorney's office conducted an investigation and determined there was insufficient evidence to bring criminal charges. On January 29, 1987, the results of that investigation were given to the Public Integrity Review Group or "PIRG." PIRG operates out of the city's Legal Department and is staffed by Houston police officers, who are charged with investigating allegations of wrongdoing by city employees. Officers from PIRG met with Leach and the new director, Ford, on March 19, 1987. The officers advised Ford to take administrative action. Ford then initiated his own investigation. He interviewed employees who were involved with, or had knowledge of, the business. Ford found that Dr. Cooper was primarily responsible for the operation of the horoscope business and that she coerced assistance from other Department employees.

He found that employees who worked in proximity to Dr. Cooper were aware of the business. As a result of his investigation, Ford forced Dr. Cooper's resignation. On August 18, 1987, PIRG filed a report of its investigation. That report sustained allegations regarding the operation of an outside business while on city time and the use of city employees to assist in an outside business while on city time. PIRG ceased its investigation after the target of its inquiry, Dr. Cooper, resigned.

### The Slavin Testimony

Leach prepared testimony for Ford in a suit brought by Sidney Slavin and Consolidated Warehouse. The suit sought to enjoin the city and the Department from operating a temporary service center on adjacent land. Slavin claimed that the service center was a nuisance and that city council was misled about notice of the service center to neighboring property owners. Ford testified in the Slavin suit on August 6 and 7, 1987. On one of those days, Leach informed Ford in the presence of city attorneys, that he (Ford) incorrectly testified about the length of time the city would be at the temporary service center and about the construction of a portable shower and restroom/locker facility. Ford had testified that the city would be there two years at most. In fact, the plans called for the city to be there at least two and a half years. Ford also had testified that the city was ready to bring the restroom/locker facility on site when in fact he had previously instructed that the facility not be fabricated.

### The Budget Crisis

Appellants, on the other hand, contend that Leach was treated no differently than eleven other employees who were laid off because of cuts in the Department's budget mandated by city council during the city's budget crises in the fall of 1987.

Under the city's budget process, the Department must begin preparing the budget for the next fiscal year approximately six months before the end of the current fiscal year. The city's fiscal year runs from July 1 to June 30. The Department must submit its proposed budget to the city's Finance and Administration Division and the mayor. Finance and Administration must then recommend any changes to the Department's proposed budget before the mayor submits it to city council for final approval. When Ford submitted the Department's proposed budget for fiscal year 1988, it did not include employee layoffs. The budget called for expenditures of $32,893,789.00 and included a user fee and discontinuance of the Department's sponsorship program that reimbursed civic associations for private hauling of garbage.

That budget was rejected on July 29, 1987, when city council approved a 3% across-the-board spending cut for every city department because of a projected $18 million shortfall in the city's budget. As a result, Ford searched for areas in the budget that could be cut without layoffs and without affecting the Department's primary function of garbage pick-up. Ford made several cuts in different areas of the budget; however, the reductions still did not meet the 3% target. Thus, Ford decided that layoffs were necessary. He also decided that he would not direct layoffs toward positions that were directly responsible for services, such as drivers, collectors, and mechanics. Ford chose twelve positions for layoffs, including three positions that reported directly to him. One of those positions was Leach's. On August 3, 1987, Ford submitted his revised budget to Finance and Administration and the mayor. That budget called for expenditures of $31,437,520.00 and included layoffs. On August 21, 1987, city council approved the Department's budget. That budget called for expenditures of $31,304,000.00. On September 2, 1987, the city formally notified Leach of his termination. Shortly thereafter, Leach obtained temporary employment with city council member George Greanias and his successor, Vince Ryan, both of whom testified for him at trial.

On November 30, 1987, Leach filed suit alleging a cause of action under TEX.REV. CIV.STAT.ANN. art. 6252–16a (the Whistleblower Act) and 42 U.S.C. § 1983. Trial

began on August 10, 1989. The issues were whether Ford discharged Leach with retaliatory intent and whether the city had a policy of retaliation against whistleblowers. The jury found that Ford terminated Leach for reporting in good faith a violation of law to an appropriate authority. The jury also found that Leach's termination was the result of an official policy, custom, or practice of the city. The jury awarded Leach damages for mental anguish but did not award exemplary damages, finding that Ford did not act with malice. The trial court subsequently entered judgment, awarding Leach back pay and benefits, damages for mental anguish, prejudgment interest, per diem interest from August 11, 1989, to the date of judgment, court costs, and attorney's fees. Appellants moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. That motion was denied.

Before addressing appellants' sufficiency points, we direct our attention to appellants' points of error complaining about the admission of certain evidence.

In their second point of error, appellants contend the trial court erred in admitting certain testimony by city council member Vince Ryan. Ryan was called as an expert witness. Ryan testified that he observed fear or hesitation among city employees to report wrongdoing. Ryan also testified that he observed that local government officials had a policy of keeping bad information in-house. Since Ryan did not become a member of city council until after Leach was discharged, appellants argue that Ryan's testimony was irrelevant and speculative. Appellants assert that Ryan was called as an expert but did not testify as one. They point out that Ryan was not asked, based on his experience, to give his opinion about whether city employees were afraid to report wrongdoing, or whether city officials had a policy of preventing the disclosure of misconduct or bad information. Rather, he was asked whether he *observed* those things as county attorney and, now, as council member. Appellants contend that Ryan's observations of city employees and city policy, both before and after Leach was discharged, have no bearing on whether Leach was discharged for reporting misconduct.

The trial court has broad discretion in determining whether to allow expert testimony and the court's action will not be disturbed absent a clear abuse of discretion. *Stanley v. Southern Pacific Co.*, 466 S.W.2d 548, 551 (Tex.1971); *McKinney v. Nat'l Union Fire Ins. Co.*, 747 S.W.2d 907, 910 (Tex.App.—Fort Worth 1988, writ granted), *aff'd*, 772 S.W.2d 72 (Tex.1989).

■ Appellants did not dispute Ryan's qualifications as an expert. Once a person is qualified as an expert he may give his opinion on any matter within the realm of his expertise, so long as the facts upon which his opinion is based either are within his personal knowledge or otherwise properly in evidence. *Southwestern Bell Tel Co. v. Sims*, 615 S.W.2d 858, 862 (Tex. App.—Houston [1st Dist.] 1981, no writ). Before becoming a city council member in January 1988, Ryan worked for seven years in the county attorney's office as liaison for the County Commissioners' Court and then as First Assistant County Attorney. As county attorney, Ryan investigated both civil and criminal misconduct by county officials. Ryan testified that while with the county, he often "compared notes" with the city on policies, practices, or customs regarding whistleblowers. Ryan also testified that he had experience with the whistleblower statute in a case involving a former county commissioner, noting there was a fear of retaliation among some county and city officials. Ryan testified that during that case, he constantly discussed with city officials their policy on whistleblowing. On cross-examination, however, Ryan admitted that prior to being a council member, he had no personal knowledge of why Leach was discharged, or of city policies regarding whistleblowing, or of any instance where the city or Ford retaliated against a whistleblower.

■ That Ryan's testimony was based on observations made both before and after Leach was discharged, went only to the weight of Ryan's testimony, not its admissibility. Evidence which tends to prove or

disprove a fact that is of consequence to the case is relevant. TEX.R.CIV.EVID. 401. Facts existing both before and after an event in controversy are relevant to establishing the cause of that event.

■ Appellants also argue that Ryan's testimony was irrelevant and inadmissible under the doctrine of res inter alios acta or "transactions involving others." *Bushell v. Dean,* 781 S.W.2d 652, 656, n. 4 (Tex. App.—Austin 1989, writ granted), *rev'd on other grounds per curiam,* 803 S.W.2d 711 (Tex.1991). That rule prohibits the admission of similar events; namely, transactions between a party to the lawsuit and a third person, and transactions between third persons. *Id.* An exception to the rule states that: "when the intent with which an act is done is material, other similar acts of the party whose conduct is drawn in question may be shown, provided they are so connected with the transaction under consideration in point of time that they may all be regarded as parts of a system, scheme, or plan." *Texas Cookie Co. v. Hendricks & Peralta,* 747 S.W.2d 873, 881 (Tex.App.—Corpus Christi 1988, writ denied) (citing *Texas Farm Bureau Mut. Ins. Co. v. Baker,* 596 S.W.2d 639, 643 (Tex.App.—Tyler 1980, writ ref'd n.r.e.)).

Appellee brought a cause of action against the city pursuant to 42 U.S.C. § 1983. Thus, an issue at trial was whether the city had a policy of retaliation against whistleblowers. Evidence of acts or conduct by other city employees or officials related directly to that issue. *Bushell,* 781 S.W.2d at 656 n. 4. Hence, Ryan's testimony was relevant and we cannot say that the trial court abused its discretion in admitting that testimony.

In their third point of error, appellants contend the trial court erred in admitting certain testimony by former city council member George Greanias. During direct examination of Greanias, the following exchange took place:

Mr. Cersonsky: I'd like to ask you now a little bit about that ordinance. Generally, can you tell us whether there was a concern or fear by Council that the lay-off ordinance—layoffs would be used for either political or personal reasons?

Mr. Thompson: Your Honor, I'm going to object to him leading the witness and speculating as to what other Council members' concerns were.

The Court: Overruled.

Mr. Greanias: Okay. During one of the City's many fiscal crises, we became concerned that there would be some folks who would be losing their jobs as the budget was cut back. One of the concerns Council had on a regular basis was that any such cut-back in the employee work force be fairly administered, that it not be used as an opportunity for any department or any individuals within departments to essentially go after somebody they didn't like very much. The effort through the Council and through, I believe a committee of Council members was to create a layoff ordinance that would establish procedure, set criteria by which these people would be selected that would have to be let go.

■ Appellants contend that Greanias' testimony impermissibly delved into the legislative intent of the city council in adopting the layoff ordinance. At trial, appellants objected that counsel's question was leading and speculative. Appellants did not object that the question inquired into legislative intent. It is well settled that an objection made at trial that does not comport with the point raised on appeal presents nothing for review. *Citizens State Bank of Dickinson v. Bowles,* 663 S.W.2d 845, 850 (Tex.App.—Houston [14th Dist.] 1983, writ dism'd); TEX.R.APP.P. 52(a). We overrule appellants' third point of error.

In their fourth point of error, appellants contend that the trial court erred in admitting evidence of Ford's testimony given in the Slavin suit. As noted above, Ford testified incorrectly about the length of time the Department would be using the temporary service center and about the fabrication of a portable restroom/shower facility for the site. At trial, appellants objected that this evidence irrelevant and was not supported by the pleadings.

■ Appellants argue that evidence of Ford's testimony in the Slavin suit is irrelevant because Ford decided to lay off Leach before testifying and before learning of the inaccuracies in his testimony from Leach. Thus, appellants assert that Ford's testimony in the Slavin suit was not a factor in Ford's decision to discharge Leach. While Ford proposed layoffs before his testimony, the final decision to discharge Leach was made after Leach reported Ford's inaccurate testimony. On August 3, Ford submitted the Department's revised budget which included a proposed layoff of Leach. On August 6 or 7, Leach reported the Slavin testimony to Ford and city attorneys. Leach's discharge did not become final, however, until Leach was formally notified by the city on September 2. Thus, evidence of Ford's testimony in the Slavin suit was relevant to the issue of whether Ford possessed retaliatory intent. TEX.R.CIV. EVID. 401, 404(b).

■ Appellants also argue that evidence regarding Ford's testimony in the Slavin suit was not supported by the pleadings. Pleadings are sufficient under the Rules of Civil Procedure if they give fair and adequate notice to their adversary of the facts upon which the pleader bases his claim. *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex.1982); *Stone v. Lawyer's Title Ins. Corp.*, 554 S.W.2d 183, 186 (Tex.1977). For a variance to be fatal it must be a substantial, misleading, and prejudicial departure from the pleadings. *Stone*, 554 S.W.2d at 186. In the absence of special exceptions, a pleading will be construed liberally in favor of the pleader. *Roark*, 633 S.W.2d at 809.

Leach's original petition specifically alleged the whistleblowing activities that he contends prompted his discharge. The petition listed the Heil and Pak–Mor reports, the Astro Reflections investigations, and the reports about the collection crews, but did not list the report about the Slavin testimony. Appellants argue that this variance was fatal. Appellants assert that the variance from the pleadings was substantial because the report about the Slavin testimony was the only evidence that di-

rectly implicated Ford. Appellants also assert that the variance was misleading because appellee specifically excluded the report about the Slavin testimony while listing the other whistleblowing activities. Appellants further assert that the variance was prejudicial because Leach used the Slavin testimony to question Ford's credibility while ignoring that Ford's layoff proposal was submitted before Leach reported the Slavin testimony.

■ Appellants did not specially except to Leach's petition. They did, however, seek to exclude evidence of the Slavin testimony in their motion in limine that was subsequently lifted by the court. As previously discussed, Leach was not formally notified of his termination until after he informed Ford and the city attorneys of Ford's inaccurate testimony in the Slavin suit. The Slavin testimony was only one piece of evidence among many relevant to the issue of Ford's intent. The function of a pleading is to define the issues at trial, not to state evidence. *Murray v. O & A Express, Inc.*, 630 S.W.2d 633, 636 (Tex. 1982); *Bader v. Cox*, 701 S.W.2d 677, 686 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). The rules do not require that a plaintiff plead his entire case with exactness. *Bader*, 701 S.W.2d at 686. Appellants have not shown that they were misled or surprised by this evidence. We overrule appellants' fourth point of error.

In their sixth point of error, appellants contend the trial court erred in admitting certain testimony by Leach that funds were available to pay Leach's salary.

■ An issue at trial was whether there were other funds outside the Department's budget available to pay Leach's salary of $27,696.00. Leach testified that Jerome Walker, the city's CDBG manager, told him that CDBG funds were available to pay his salary. Community development block grant funds or CDBG funds were federal funds allocated to the city and outside of the city's general fund. City departments bid on these funds for use in special projects. Leach similarly testified that Al Mayes, who was in Finance and Administration and "in charge" of the bond

programs for the city, told him that unprogrammed bond funds were available to pay his salary. At trial, appellants objected that this testimony was hearsay and that neither person was identified in discovery. On appeal, appellants contend only that Walker and Mayes were not identified in discovery. The discovery conducted in this case is not a part of the record. Thus, we cannot say whether Walker and Mayes were in fact identified in discovery. The party seeking review has the burden of presenting a sufficient record to show error requiring reversal. TEX.R.APP.P. 50(d). Furthermore, this evidence was cumulative since Leach, as manager of the community development plan, previously testified that these funds were available to pay his salary. As manager, Leach coordinated the budgets of both CDBG and bond funds. The trial court did not abuse its discretion in admitting Leach's testimony.

We now address appellants' first point of error, complaining that there is no evidence or insufficient evidence to support the jury's finding that Ford terminated Leach for reporting a violation of law to an appropriate authority.

When both legal and factual sufficiency points are raised, we must first examine the legal sufficiency of the evidence. *Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981). In reviewing a "no evidence point," we are to consider only the evidence and inferences that tend to support the jury's finding and disregard evidence and inferences to the contrary. *Sherman v. First Nat'l Bank,* 760 S.W.2d 240, 242 (Tex.1988). If there is any evidence of probative value to support the finding, we must uphold the jury's finding and overrule the point of error. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). If the finding is supported by legally sufficient evidence, we must then weigh and consider all the evidence, both in support of, and contrary to the challenged finding. *Id.* The jury's finding must be upheld unless it is so against the great weight and preponderance of the evidence as to be manifestly unjust or erroneous. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). We are not free to

substitute our judgment for that of the jury simply because we may disagree with the jury's verdict. *Herbert v. Herbert,* 754 S.W.2d 141, 142 (Tex.1988).

The so-called "Texas Whistleblower Act" (the Act) prohibits a local government from terminating an employee for reporting "a violation of law to an appropriate law enforcement authority if the employee report is made in good faith." *Lastor v. City of Hearne,* 810 S.W.2d 742, 743 (Tex.App.—Waco 1991, writ denied); TEX.REV.CIV.STAT. ANN. art. 6252–16a § 2. The Act protects employees who in good faith believe they are reporting a violation of law, regardless of whether their belief is correct. *Lastor,* 810 S.W.2d at 744. An employee has the burden of proving that he was terminated for reporting a violation of law. TEX.REV. CIV.STAT.ANN. art. 6252–16a § 3(b). The Act provides the aggrieved employee with a presumption of retaliation if he is terminated "not later than the 90th day after making a report." *City of Dallas v. Moreau,* 697 S.W.2d 472, 476 (Tex.App.—Dallas 1985, no writ); TEX.REV.CIV.STAT.ANN. art. 6252–16a § 3(b). While there was evidence that Leach was terminated within 90 days of reporting the Slavin testimony, the jury was not instructed to apply this presumption. In addition, it was undisputed that Ford's actions in terminating Leach were referable to the duty Ford owed to the city and were accomplished while in the discharge of that duty. *See City of Brownsville v. Pena,* 716 S.W.2d 677, 681 (Tex. App.—Corpus Christi 1986, no writ).

The issue of whether Ford had a retaliatory motive in terminating Leach was hotly contested. Appellants contend that Leach offered no direct evidence in the form of testimony or documents that Ford terminated him because he reported a violation of law to an appropriate law enforcement authority. They point out that Leach relied solely on circumstantial evidence from which the jury could not have reasonably inferred retaliatory motive. We recognize that in the absence of a "smoking gun," circumstantial evidence is often the only method of proving another's intent.

As evidence of Ford's retaliatory intent, Leach points to the following:

(1) Leach was a whistleblower.

(2) Other employees were aware of Astro Reflections but only Leach reported it and only he was terminated.

(3) Ford acted pursuant to a city policy of retaliation against whistleblowers.

(4) Ford never posted notices of employee rights under the Act.

(5) Leach's position was eliminated so that if he won reinstatement he would have no job to return to.

(6) Unprogrammed CDBG funds and bond funds were available to pay Leach's salary.

### Leach Was A Whistleblower

■ As previously noted, an employee is protected under the Act if he reports what he in good faith believes is a violation of law. *Lastor*, 810 S.W.2d at 744. Thus, it is irrelevant whether an employee does not report an actual violation of law as long as he acts in good faith. Appellants do not dispute whether Leach acted in good faith. In fact, their point of error conspicuously omits the "good faith" language included in the Act. Appellants argue only that Leach's reports did not allege violations of law. Since the record clearly reflects that Leach's allegations of wrongdoing were made in good faith, we need not review the evidence to determine whether those allegations were in fact true.

### Astro Reflections

Leach contends that Astro Reflections was an embarrassment to the Department because of allegations of former director Ware's involvement. Aside from Ware and Dr. Cooper, ten Department employees were aware of Astro Reflections. Only Leach reported this activity and only he was terminated. Leach points out that Ford's own investigation revealed that other employees were aware of the business but were afraid to speak out because they were afraid of both Dr. Cooper and Ware. The notes of Ford's investigation show that many of the employees interviewed by Ford worked at one time or another for Astro Reflections at the request of Dr. Cooper. Several stated that Ware knew of the business. Leach contends that, while Ford initiated his own investigation, Ford also attempted to suppress information. He instructed Leach not to gather purchasing documents and telephone records of Astro Reflections and he quit making notations in his personal calendar of meetings held during his investigation. Ford, on the other hand, testified that he instructed Leach to refrain from gathering documents and records only because PIRG was gathering that evidence. Appellants also emphasize that there was no evidence that Ford's personal calendar contained anything more than the dates and times of appointments. It did not contain notes of what occurred in those meetings.

Appellants contend that allegations about Astro Reflections had no bearing on Ford's intent because they involved conduct by other employees who did not participate in the decision to discharge Leach. In fact, Astro Reflections involved conduct that occurred before Ford became director. When Leach brought these allegations to Ford's attention, Ford ordered Dr. Cooper to stop operating the business on city time. In addition, he asked Leach to set up a meeting with PIRG and city attorneys to discuss the PIRG investigation. Ford conducted his own investigation and eventually forced Dr. Cooper to resign. Ford testified that he did not take disciplinary actions against other employees directly involved in the business because he believed they were coerced by Dr. Cooper. The other employees involved included Emma Dyer, who typed documents for the business; Billy Alexander, who delivered packages for the business; and Assistant Director Thomas Buchanan, who assisted Dr. Cooper with the software. Contrary to the notes of his investigation, Ford testified that Buchanan was unaware that his assistance to Dr. Cooper was related to Astro Reflections.

### City Policy of Retaliation

Leach contends that the testimony of council member Ryan and former council member Greanias establishes the existence

of a city policy of retaliation against whistleblowers. Ryan testified that city employees were afraid to report wrongdoing and that city officials had a policy of preventing disclosure of bad information or misconduct. Greanias testified that the city's layoff ordinance was passed because city council was concerned that a budget crisis would be used by Department heads as a pretext for firing employees they disliked. Leach also contends that the notes of Ford's investigation further establish the existence of a city policy of retaliation. Those notes reflect that several employees expressed fear about speaking out about Astro Reflections. Leach further points to the PIRG investigation and the sworn affidavit of Billy Alexander. Alexander explained that he was afraid to speak out about Astro Reflections because he "read where some people do that high-up and a day or two later they are fired or laid-off...."

Appellants contend there is no evidence that Ford terminated Leach pursuant to a city policy of retaliation against whistleblowers. Appellants argue there is no evidence of specific instances where the city or Ford retaliated against an employee. Neither Ryan nor Greanias had personal knowledge of a situation where the city retaliated against a whistleblower. Appellants maintain that the fear expressed by employees in the investigations by Ford and PIRG reflect fear of Dr. Cooper, not of Ford or of any city policy or practice.

### Posted Statutory Notices

Article 6252–16a § 6 requires each state or local governmental body to post a notice of employees' rights under the Act. Ford did not post notices until September or October 1987, after Leach was discharged. Leach argues this is evidence of Ford's retaliatory intent and his attitude toward whistleblowers. Leach points out that Ford had 17 years experience in government service, including seven years of service with the City of Fort Worth, and that he was familiar with the Act.

Appellants contend that Ford posted the required notices before Leach filed this suit. Appellants argue that Ford in fact encouraged whistleblowing. Ford testified to one instance where four employees came forward with allegations that a supervisor was stealing fuel. The supervisor was recommended for termination and no disciplinary action was taken against the four employees. Ford testified to other instances in which an employee was using drugs on a collection route and in which collectors were trying to extort money or favors from citizens in return for service. Ford testified that appropriate disciplinary measures were taken against the offenders and that the whistleblowers were not punished. Ford even had a program, called a "Hey Uly letter," that encouraged employees to submit anonymous reports directly to the director. Leach points out that none of the examples of whistleblowing cited by Ford involved wrongdoing by the director or reports to outside departments or agencies.

### Elimination Of Leach's Position

Appellants contend that the elimination of Leach's position was a mistake and was not to punish Leach for whistleblowing as Leach contends. Ford testified that when he submitted the personnel roster to city council after council had approved the budget, he inadvertently included the twelve positions targeted for layoffs with vacant positions targeted for elimination. Ford testified that he brought the mistake to council's attention, after realizing that those who were laid off would not be paid through their effective termination date.

During the council meeting of September 16, 1987, council member Jim Greenwood stated that he did not think it was coincidental that the positions eliminated were those of the employees who were laid off. Greenwood expressed concern that employees who appealed their layoff would have no job to return to if they won reinstatement. Leach argues that Greenwood's comments as reflected in the minutes from the meeting are further evidence of Ford's intent and of a city policy of retaliation. However, the minutes also reflect Greenwood's understanding that the problem would be corrected and city council's deci-

sion to postpone approval of the Department's personnel roster for that purpose. Appellants argue that this is consistent with Ford's testimony that he informed city council of the mistake before the meeting.

### Availability Of Other Funds

Leach contends that other funds outside the city's general fund were available to pay his salary and that the budget cuts mandated by the city were simply a pretext for his termination. Leach testified that there was $16,953.00 in unprogrammed CDBG funds available to pay his salary. As previously noted, CDBG funds were federal funds allocated to the city for use in special projects. Leach testified that in 1987, he brought $450,000.00 in CDBG funds to the Department. He testified that he managed those funds as well as bond funds. The CDBG funds were used for three heavy trash pick-up programs. One-half of the funds were budgeted for the salaries of Department employees involved in those programs. Leach also testified that there was $159,822.02 in unprogrammed bond funds available to pay his salary.

Leach maintains that other departments utilized CDBG and bond funds to pay the salaries of regular, full-time employees and, thus, avoid layoffs. Leach claims that his services were valuable to the Department and that these funds should have been used to pay his salary even though they were not used to pay the salaries of the eleven other employees who were also laid off. Leach further points out that Section 14–141(f) of the city's layoff ordinance authorizes the use of CDBG and bond funds to pay regular full-time employees. Section 14–141(f) states that a department director must give notice to persons assigned to positions funded, in whole or in part, by state or federal grants, that continued employment is conditioned on the city's continued receipt of those funds. There was also an additional $133,520.00 cut from the Department's budget between August 3, when the revised budget was submitted to city council, and August 21, when city council finally approved the budget. Since these cuts were made without the necessity of layoffs, Leach argues there was additional money within the Department's regular budget to pay his salary.

Ford testified that regular, full-time positions in the Department were "funded 100%" by the city's general fund. He testified that neither CDBG nor bond funds were available to pay the salaries of regular, full-time employees, including Leach. He stated that city departments, including Solid Waste, utilized these funds to pay salaries only for certain employees under certain conditions. Ford testified that the heavy trash pick-up programs funded by CDBG funds were temporary and not included in the Department's budget. He stated that CDBG funds were used to pay for the operation costs of those programs, including overtime to drivers and laborers. Ford also testified that bond funds were used only for special construction projects planned by the Department. He stated that a percentage of bond funds were set aside only to pay the salaries of full-time Public Works Department employees such as engineers and inspectors, who supervised those construction projects. Ford testified that the city's layoff ordinance does not specifically authorize the use CDBG fund or bond funds to pay the salaries of regular, full-time Department employees. Appellants also note that the extra $133,520.00 cut from the budget before it was finally approved means only that the Department had less money, not more.

██ The trial was essentially a swearing match between Ford and Leach. When presented with conflicting evidence, the trier of fact has several alternatives: it may believe one witness and disbelieve others; it may resolve the inconsistencies in the testimony of any witness; and, it may accept lay testimony over that of experts. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex.1986). We have thoroughly reviewed the record and while we might not have reached the same conclusion as the jury, we find the evidence sufficient to support its verdict. We overrule appellants' first point of error.

In their fifth point of error, appellants contend that jury question no. 1 and the accompanying charge were erroneous because they permitted the jury to find in favor of Leach based on conduct that was not protected by either Tex.Rev.Civ.Stat. Ann. art. 6252–16a or the First Amendment.[1]

The trial court submitted both Leach's first amendment claim and article 6252–16a claim under jury question no. 1, which asked whether Ford terminated Leach for reporting a violation of law to an *appropriate authority*. The court reasoned that reporting violations of law to an appropriate authority is necessarily a matter of public concern and, thus, also protected under the first amendment. Appellants objected that the question submitted was overly broad and misleading. They argued that the court should have provided accompanying definitions or instructions regarding the types of activities that were protected by the first amendment or article 6252–16a. Appellants also objected that "appropriate law enforcement authority" was not specified in the question or in the instructions. The court overruled appellants' objections and refused to submit their proposed instructions.

Appellants do not dispute that Leach's conduct of reporting Astro Reflections to the district attorney's office is protected under article 6252–16a and the first amendment. Appellants contend, however, that Leach's other reports are not protected because they were neither made to an appropriate law enforcement authority nor addressed matters of public concern.

 Tex.R.Civ.P. 277 provides that the trial court shall submit such explanatory instructions and definitions as would be proper to enable the jury to render a verdict. A trial court's refusal to submit requested instructions will not be overturned on appeal unless the court abused its dis-

cretion. *Magro v. Ragsdale Bros. Inc.,* 721 S.W.2d 832, 836 (Tex.1986). As with the submission of explanatory instructions, the trial court has wide discretion in submitting special issues to the jury. *Harris County v. Bruyneel,* 787 S.W.2d 92, 94 (Tex.App.— Houston [14th Dist.] 1990, no writ). When statutory violations are the basis of special issues, issues should be submitted in terms as close as possible to those actually used in the statute. *City of Brownsville v. Pena,* 716 S.W.2d 677, 680 (Tex.App.—Corpus Christi 1986, no writ) (citing *Brown v. American Transfer and Storage Co.,* 601 S.W.2d 931, 937 (Tex.1980), *cert. denied,* 449 U.S. 1015, 101 S.Ct. 575, 66 L.Ed.2d 474 (1980). The language of the statute may be altered somewhat to conform the issue to the evidence of the case. *Brown,* 601 S.W.2d at 937.

By its terms, Article 6252–16a requires an employee to report a violation of law to an appropriate *law enforcement* authority. Appellants contend that by not limiting the jury to consider only those reports made to *law enforcement* authorities, the court allowed the jury to find for Leach based on activities that were not protected under article 6252–16a.

 "An appropriate law enforcement authority" under article 6252–16a, § 2, "includes at minimum any public authority having the power and duty of inquiring into the lawfulness of the questioned conduct and causing its cessation if the conduct appears to be a violation of law." *Travis County v. Colunga,* 753 S.W.2d 716, 719–20 (Tex.App.—Austin 1988, writ denied). Appellants' proposed instruction would have limited "an appropriate law enforcement authority" to mean "the district attorney." Leach's report about the Heil contract was made not only to then-director Ware, but also to Ford. Leach also informed the Purchasing Department, the Legal Department, the mayor's office

---

1. Leach sued under Tex. Const. Art. I, § 8, as well as under the first amendment. There is, however, no state constitutional tort which affords redress under 42 U.S.C. § 1983. *Bagg v. University of Texas Medical Branch,* 726 S.W.2d 582, 584, n. 1 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). Furthermore, the free speech provision of the Texas Constitution does not give less protection to employees than that afforded by the first amendment. *Jones v. Memorial Hosp. Sys.,* 677 S.W.2d 221, 224 (Tex. App.—Houston [1st Dist.] 1984, no writ). Thus, no separate discussion of its applicability is necessary.

and city council about the "irregularities" under the Heil contract. Leach's report about the collection crews was made to Ware. Leach's report about Ford's testimony in the Slavin suit was made to Ford in the presence of city attorneys. In each instance, we hold that a report was made to an appropriate law enforcement authority.

As to the Heil contract, Ware or Ford as well as any one of the other entities had the power and the duty under the law to determine the lawfulness of the matter being reported, to order a halt or a change in the matter reported, or to discipline on account of the alleged violations being reported. *City of Dallas v. Moreau,* 697 S.W.2d 472, 474 (Tex.App.—Dallas 1985, no writ). The same holds true for Ware's responsibilities with respect to the collection crews. As to the Slavin testimony, the city attorneys may not have had the power or duty to arrest, prosecute, or otherwise discipline Ford on account of the alleged violation being reported, but they clearly had an ethical responsibility to report Ford's conduct to the district attorney, who could have prosecuted Ford.

Appellants also contend that Leach's activities (other than Astro Reflections) did not address matters of public concern. Appellants assert that Leach spoke solely in his role as an employee and not as a citizen commenting upon matters of public concern. Appellants point out that the Leach's communications were made in-house, to his supervisor, and in the performance of his duties.

■ The first amendment protects speech by an employee commenting as a citizen on a matter of public concern. *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record. 461 U.S. at 147–48, 103 S.Ct. at 1690–91.

■ That some of the reports were made in-house, directly to the director, is of little significance. Freedom of speech is not lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public. *Givhan v. Western Line Consol. School,* 439 U.S. 410, 415, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979). Appellants contend that the Heil and Pak–Mor reports revealed both undercharges and minor overcharges by city contractors, as well as technical violations of city purchasing procedures. Appellants point out that the Heil program saved the city money and that neither report alleged wrongdoing by city employees. Thus, they contend the reports did not involve a matter of public concern. We disagree. The Heil and Pak–Mor reports detailed the purchase of non-contract parts and labor using taxpayers' funds without taking competitive bids or obtaining approval from city council. In particular, the Pak–Mor report divulged overpayments of taxpayers' money to a city contractor and recommended an investigation by the city's Legal Department for possible criminal or civil violations committed by the contractor. The expenditure of public funds by the city, is a proper subject of public concern and citizens' comments. *See Schweitzer v. University of Texas Health Center at Tyler,* 688 F.Supp. 278, 283 (E.D.Tex.1988).

■ Appellants contend that the report about collection crews demanding money and favors in return for providing city services involved isolated minor infractions of low-level employees. Appellants assert that the report did not allege that the practice was widespread within the Department or that it was condoned by management. Leach testified, however, that he informed the assistant director in charge of collections about the practices of the crews, but the director stated that he did not think the crews were engaged in any wrongdoing. The implication was that high level officials in the Department were aware of, and approved, the practices of the collection crews. Extortion of money and/or favors over a period of years by city employees with the approval of their superiors is certainly of interest to the public.

■ As to the report on Ford's testimony in the Slavin suit, appellants point out

that it was Leach who prepared Ford's testimony. Appellants contend that the report revealed only that Ford may have inaccurately testified on minor issues of little interest to the public. In fact, the report was made in the presence of city attorneys and alleged that Ford gave perjured testimony. The disclosure of misbehavior by public officials is a matter of public interest. *Brawner v. City Of Richardson, Texas,* 855 F.2d 187, 191 (5th Cir. 1988). Because we find that all of Leach's activities are protected under article 6252–16a and the first amendment, it was not an abuse of discretion for the trial court to instruct the jury as it did. We overrule appellants' fifth point of error.

In their seventh point of error, appellants contend there is no evidence or insufficient evidence to support the jury's finding that Leach's termination resulted from an official policy, custom, or practice of the city.

Municipal liability under 42 U.S.C. § 1983 must be predicated on governmental custom or policy. *Monell v. New York Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *City of Houston v. De Trapani,* 771 S.W.2d 703, 705 (Tex.App.—Houston [14th Dist.] 1989, writ denied). A single act may suffice to create liability. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986); *De Trapani,* 771 S.W.2d at 705. Municipalities, however, cannot be held liable on a theory of *respondeat superior. Monell,* 436 U.S. at 691, 98 S.Ct. at 2036. Only those municipal officials who have "final policymaking authority" may by their actions subject the government to § 1983 liability. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988); *Pembaur,* 475 U.S. at 481, 106 S.Ct. at 1299. That a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on the exercise of that discretion. *Pembaur,* 475 U.S. at 481–82, 106 S.Ct. at 1298–99. Whether a particular official has "final policymaking authority is a question of state law." *Praprotnik,* 485 U.S. at

124, 108 S.Ct. at 924; *Pembaur,* 475 U.S. at 483, 106 S.Ct. at 1300.

Leach did not offer evidence that other employees were terminated for "having blown the whistle." Ford's single act of terminating Leach subjects the city to liability only if Ford was a final policymaking authority. Leach asserts that Ford was a final policymaking authority because city council delegated its power to establish final employment policy to each department head. Leach cites a portion of the city's layoff ordinance which provides that, "when it becomes necessary to lay off one employee or more in the same classification in a department the one or ones to be laid off shall be determined by the department head." HOUSTON TEX., HOUSTON CODE § 14–141(a).

In determining layoffs, Ford was obligated to follow the city's layoff ordinance passed by city council. That ordinance requires a department director to choose the job classification in which there will be layoffs. HOUSTON, TEX., HOUSTON CODE § 14–141 (1987) (effective May 6, 1986). If there is more than one employee in a classification, employees are laid off according to a combination of their job performance and seniority. *Id.* The ordinance requires the director to submit his layoff plan for review by the city's Affirmative Action Division and the Personnel Department, formerly known as the Department of Civil Service. HOUSTON, TEX., HOUSTON CODE § 14–144(a) (1987) (effective May 6, 1986). Each employee laid off has a right to an appeal before the Civil Service Commission. HOUSTON, TEX., HOUSTON CODE § 14–144(b) (1987) (effective May 6, 1986).

The commission is permitted to review only whether the layoff was accomplished "in accordance with this rule." *Id.* The commission is not allowed to "substitute its judgment for that of the department head as to any decision made within the legitimate discretion of the department head." *Id.* "The commission may uphold the layoff as presented, uphold it in part and change it in part, or take any action necessary to conform the layoff to this rule." *Id.* "Layoffs reviewed and sustained by

the commission shall not be subject to any other administrative *recourse, review or appeal process."* *Id.*

A review of the city charter and city code reflect that final policy making authority with respect to city employment is vested in the civil service commission, city council, and the mayor. Article Va, section 1 of the city charter calls for the creation of a civil service commission. Section 2 provides that "the civil service commission, with the approval of city council, shall make such rules and regulations necessary for the proper conduct of its business as it shall find necessary and expedient; but all rules made by the commission may be changed or amended by the city council." Section 4 states that such rules and regulations "shall include such provisions as may be necessary to prohibit discrimination in employment...." Section 3, entitled "Removal of Employees," states that "any employee may be suspended by the head of the department under which he is employed...." "The officer making the order of suspension" must file with the commission "a statement of the suspension and his reasons therefor." The employee may appeal to the commission which must presume that the judgment of the officer suspending the employee was correct. The commission's decision to permanently dismiss or reinstate the employee is final.

Article VI, section 7a of the city charter states that "the mayor shall also have the power to appoint and remove all other employees of the city, such appointments and removals to be subject, however, to the civil service provisions of the Charter." Section 14–182 of the city code, entitled "Removal; Demotion; Suspension," provides that "the mayor may for just cause indefinitely suspend ... without pay any civil service employee, which action shall be subject to review by the commission...." HOUSTON, TEX., HOUSTON CODE § 14–182 (1968). That section also provides that "any department head may recommend to the mayor that any civil service employee be indefinitely suspended ... for just cause...." "Such action shall be considered by the mayor and forwarded to the

commission for review...." Clearly, the civil service commission and city council are charged with creating and passing rules and regulations to prevent discrimination in city employment. Furthermore, any action by a department head to circumvent those rules is subject to intermediate review by the mayor and final review by the civil service commission. We are aware of article Va, section 2 of the city charter which provides that certain "executive level employees" whose duties require them "to maintain a direct, confidential relationship with an appointive official of the city" are excepted from eligibility to civil service classification. However, there is no evidence that Leach falls within this category.

In an attempt to strike a balance between respondent superior on the one hand and blanket immunity on the other hand, the Supreme Court explained that:

> When an official's discretionary decisions are constrained by polices not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies.

*De Trapani,* 771 S.W.2d at 706 (citing *Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926).

According to the guidelines set out in *Praprotnik,* we find that Ford was not a final policymaking authority. To infer the existence of a city policy from the isolated misconduct of a single, low level officer and then to hold the city liable on the basis of that policy would amount to permitting precisely the theory of strict respondeat superior liability rejected in *Monell. City of Oklahoma City v. Tuttle,* 471 U.S. 808, 831, 105 S.Ct. 2427, 2440, 85 L.Ed.2d 791 (1985). Hence, we find there is no evidence to support the jury's finding that Leach's termination was the result of a City policy, practice, or custom and we sustain appellants' seventh point of error.

We note that the jury's answer to question no. 2, which asked whether there was

a city policy of retaliation, was conditioned on the jury's answer to question no. 1, which asked whether Leach was terminated for whistleblowing. Both questions, however, independently establish a cause of action against the city under the Whistleblower Act and under § 1983, respectively. Thus, by sustaining appellants' seventh point of error with respect to question no. 2, we need not reverse the judgment since we have also concluded that there was sufficient evidence to support the jury's answer to question no. 1. Accordingly, we affirm the judgment of the trial court.