TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-99-00751-CV







State of Texas, Appellant



v.



One Super Cherry Master Video 8-Liner Machine, et al., Appellees







FROM THE DISTRICT COURT OF BURNET COUNTY, 33RD JUDICIAL DISTRICT


NO. 19,048, HONORABLE V. MURRAY JORDAN, JUDGE PRESIDING






 The State of Texas appeals from a judgment rendered on the jury's verdict in a
forfeiture action brought by the State against property owned by Alvin Ray Fenter and P.F.A.
Corporation. See Tex. Code Crim. Proc. Ann. art. 18.18(b)-(g) (West Supp. 2001). We will
affirm the judgment.

 The disputed property consists of thirty-two machines described as "eight liners,"
each of which is alleged to be a "gambling device" as that term is defined in section 47.01(4) of
the Texas Penal Code; related articles alleged to be "gambling paraphernalia" as defined in section
47.01(6) of the Texas Penal Code; and, currency alleged to be "gambling proceeds" within the
meaning of article 18.18(b) of the Code of Criminal Procedure. See Tex. Penal Code Ann.
§§ 47.01(4), 47.01(6) (West Supp. 2001); Tex. Code Crim. Proc. Ann. art. 18.18(b).

 The jury failed to find the disputed articles of property were gambling devices,
gambling paraphernalia, or gambling proceeds. Based on the verdict, the trial court rendered
judgment ordering that the property be returned to Fenter and P.F.A. Corporation from whom
it had been seized by State officers. The State appealed to this Court on three issues.

 1. Whether the evidence is legally or factually insufficient to support the judgment. 
The State complains the evidence is legally and factually insufficient to justify the jury's "no"
answer to each of three special questions: (a) were any of the eight liners a gambling device; (b)
were any of the other disputed articles gambling paraphernalia; and (3) were any of the cash items
gambling proceeds? We concur with the position of Fenter and P.F.A. Corporation that the
alleged gambling paraphernalia and gambling proceeds can have that character only if the eight
liners are gambling devices. Consequently, we will discuss only that aspect of the evidence.

 The Texas Penal Code, in section 47.01(4), defines as follows the term "gambling
device":


(4) "Gambling device" means any electronic, electromechanical, or mechanical
contrivance not excluded under Paragraph (B) that for a consideration affords
the player an opportunity to obtain anything of value, the award of which is
determined solely or partially by chance, even though accompanied by some
skill, whether or not the prize is automatically paid by the contrivance. The
term:


 (A) includes, but is not limited to, gambling device versions of bingo, keno,
blackjack, lottery, roulette, video poker, or similar electronic,
electromechanical, or mechanical games, or facsimiles thereof, that
operate by chance or partially so, that as a result of the play or operation
of the game award credits or free games, and that record the number of
free games or credits so awarded and the cancellation or removal of the
free games or credits; and


 (B) does not include any electronic, electromechanical, or mechanical
contrivance designed, made, and adapted solely for bona fide amusement
purposes if the contrivance rewards the player exclusively with noncash
merchandise prizes, toys, or novelties, or a representation of value
redeemable for those items, that have a wholesale value available from
a single play of the game or device of not more than 10 times the amount
charged to play the game or device once or $5, whichever is less.



Tex. Penal Code Ann. § 47.01(4) (emphasis added).

 Before summarizing the material evidence, we should establish what the State was
required to show in order to prove the eight liners were gambling devices within the definition
of section 47.01(4). It is plain on the face of section 47.01(4) that the State was required first to
show the eight liners came within the terms of section 47.01(4)(A), including the proviso that they
were "not excluded under Paragraph B." The State contends, however, that it was not required
to negate by its proof the applicability of the exclusion found in section 47.01(4)(B). We
disagree. We believe the structure and text of section 47.01(4)(A) and (B) indicate a legislative
intent that the definition of "gambling device" should be incomplete without both subsections
(4)(A) and (4)(B)-that both subsections are integral and essential parts of a single statutory
definition. See State v. Wofford, 34 S.W.3d 671, 675-76 (Tex. App.-Austin 2000, no pet.). 
Consequently, the State bore the additional burden of negating the applicability of section
47.01(4)(B) in order to prove the eight liners were gambling devices within the meaning of the
entire statute. As discussed below, we believe the State's proof failed in this respect.

 In connection with Special Question Number One, the term "gambling device" was
defined by a quotation of section 47.01(4) in its entirety; that is to say, the quotation included 
subsection 47.01(4)(A) and the exclusion found in subsection 47.01(4)(B).

 For the State to prevail on its legal-insufficiency complaint, we must be able to
conclude that no evidence supports the jury's failure to find the eight liners were gambling devices
and that the entire record establishes as a matter of law that the eight liners were gambling devices
within the statutory definition. See Victoria Bank & Trust Co. v. Brady, 811 S.W.2d 931, 940
(Tex. 1991). For the State to prevail on its factual-insufficiency complaint, we must be able to
conclude, after consideration of all the evidence, that the jury's "no" answer is against the great
weight and preponderance of the evidence, and we may reverse the judgment only if the great
weight and preponderance of the evidence supports a "yes" answer. See Ortiz v. Jones, 917
S.W.2d 770, 772 (Tex. 1996); Ames v. Ames, 776 S.W.2d 154, 159 (Tex. 1989). In our view,
both complaints fail with respect to section 47.01(4)(B). We will summarize all the evidence
material to that proposition.

 The thirty-two eight liners were seized from premises known as the Monte Carlo
operated by Fenter and P.F.A. Corporation. The eight liners bore tax stamps issued by the
Comptroller and the conspicuous legend "For Amusement Only." The eight liners resemble slot
machines and require quarters or paper currency in denominations of one, five, ten, or twenty
dollars to play. The eight liners operate on a combination of skill and chance, according to some
evidence; according to State witnesses, they operate purely by chance and a player can do nothing
to enlarge his chances of winning. The eight liners differ from slot machines in that the former
do not dispense money. Instead, eight liners record credits representing, in this instance, the
player's winnings in denominations of one cent or five cents, depending upon the particular
machine. A player having the requisite number of credits may, by pushing a button on his
machine, cancel his existing credits and receive in return a ticket or tickets issued by the machine. 
Each ticket represented one-dollar. Five such tickets could be exchanged with a Monte Carlo
employee for a five-dollar gift certificate redeemable for merchandise at any of four nearby
mercantile establishments; or, at the customer's request his tickets could be exchanged for
currency that a Monte Carlo employee would deposit in the machine of the customer's choice in
order that he might continue playing. As stated below, the State adduced evidence that purported
to vary the foregoing practice with respect to the employee depositing the currency in a machine
in order that the customer might continue playing.

 Fenter testified he purchased the eight liners; their internal computers controlled
the machines and came "preset" from his supplier; he did not know how the computers worked;
in buying the machines he directed that they be set "[t]o comply with the Texas statute"; and, so
far as he understood, they were "designed, made, and adapted solely for bona fide amusement,"
that is to say, for "fun." He knew no reason why his machine did not comply with the law. A
"single play" of the game, in his opinion, was a player's receiving one ticket from the machine
he was playing, but Fenter was not sure that such was the meaning of the term "single play of the
game or device" as that term is used in section 47.01(4)(B). When shown photographs of the
thirty-two machines allegedly seized from the Monte Carlo by the State, Fenter stated he could
not identify them with certainty as his machines because some of the machines portrayed in the
photographs bore markings that were not put on his machines by him or his employees.

 Joe Matlock, an employee in the Special Crimes Service of the Texas Department
of Public Safety, testified he participated in the seizure of the eight liners taken from the Monte
Carlo. So far as he knew, the machines had not been tampered with since they were taken into
State custody and placed in a storage facility in Round Rock. He did not, however, accompany
the machines to that location. Afterward, he opened one of the stored machines and saw "tests"
performed on them. Matlock did not know how many times the machines had been played since
they were seized, but some were played while in storage; he did not know if disconnecting power
from an eight liner changed its computer-controlled operation; nor did he know if the machine
displayed in the courtroom for demonstration purposes was in the same condition as when it was
seized from the Monte Carlo.

 Matlock testified further that he did not know if the seized machines were
"designed, made, and adapted solely for bona fide amusement purposes" as that term is used in
section 47.01(4)(B), but in his opinion the word "amusement" meant that nothing of value
whatsoever could be received as a result of playing a machine. Consequently, the seized machines
were not, in his opinion, "solely for bona fide amusement purposes." He conceded, however,
that he had never attempted to learn by investigation whether the seized machines were "designed,
made, and adapted solely for bona fide amusement purposes."

 Matlock gave it as his opinion that "a single play of the game or device" meant one
push of the button on a machine, (1) causing the cylinders showing the various icons to rotate; the
tickets issued by the machines did not have a wholesale value; and the gift certificates were not
"non-cash merchandise prizes" within the meaning of section 47.01(4)(B). He conceded he could
not describe a machine that could operate so as to fit within the exclusion found in section
47.01(4)(B). Matlock testified that an eight liner displayed in court for demonstration purposes
was in and of itself a gambling device within the meaning of section 47.01(4), in his opinion, but
he admitted testifying to the opposite effect on deposition. He did not know if the computers
("circuitry boards") that controlled the operation of the machines had anything to do with whether
they were gambling devices within the meaning of the statute.

 Before the State's seizure of the machines, Matlock had gone "undercover" to the
Monte Carlo to investigate the operation of eight liners there. He heard some patrons ask to
exchange their tickets for "cash back to the machines," or simply "for cash." While in some
instances the Monte Carlo employee would respond by depositing the currency into a machine
selected by the customer, for renewed play, in other instances Matlock saw the employee simply
give the currency to a customer who personally deposited it in a machine to continue playing.

 Matlock played several machines. Each time he played, he won more than ten
times the amount he bet; and, he saw others do the same. After overhearing other customers use
the expression "cash back to the machine" or "cash back," he used the first expression in
exchanging his tickets for cash. The Monte Carlo employee gave him sixteen dollars, five of
which he deposited in a machine and eleven of which he put in his wallet and took with him, for
evidence purposes, on leaving the Monte Carlo. While he saw others receive cash in exchange
for their tickets, he conceded he was the only person who was able to take the cash from the
premises. He conceded he could understand how the employee who gave him the sixteen dollars
thought he was going to put the money back in a machine to continue playing, and admitted he
had "deceived" the employee by representing that he wanted the cash to put back into a machine. 
He also admitted he did not include in his report of the investigation his observation that those
who had received cash from a Monte Carlo employee used it solely to continue playing the
machines.

 Marshall Caskey was commander of the Special Crimes Service at the time the
eight liners were seized at the Monte Carlo. Before his examination of the seized machines, he
had almost no computer training and did not know how the machine operated. In his opinion, the
eight liners operated purely by chance and, that being the case, there was no possibility section
47.01(4)(B) could apply; (2) a gift certificate is not a "noncash merchandise prize" within the
meaning of section 47.01(4)(B); and, a "single play of the game or device," within the meaning
of the statute, is simply one push of the button to start the cylinders rotating. He conceded he
could not tell the jury from personal knowledge that any specific person had ever received more
than ten times the amount of a "single play" of the seized machines. And, he admitted, every
time anyone questioned his interpretation of "the statute" (section 47.01(4)(B)), he generally
responded by saying, "you're just trying to confuse the issue."

 The charge to the jury included a list of numerous propositions of which the trial
judge had taken judicial notice. None of them bear on section 47.01(4)(B) and we need not refer
to them for that reason.

 We believe the jury could, based upon the evidence adduced, reasonably answer
"no" to Special Question Number One which asked: "Do you find from a preponderance of the
evidence that any of the property that is the subject of this suit is a gambling device?" It appears
that no evidence was adduced that anyone left the Monte Carlo with cash except Matlock, who
admitted he had received the cash from a Monte Carlo employee by deception and put part of it
in his wallet while using the balance to continue playing the machines. And the jury were free
to conclude, in our view, that the tickets obtained from the eight liners were exchanged for
"noncash merchandise prizes," in the ordinary meaning of those words as used in section
47.01(4)(B). So far as the evidence indicates, the tickets were exchangeable solely for continued
play of the machines or for gift certificates redeemable for merchandise at four area merchants. 
As used in the statute, the term "noncash merchandise prizes" implies its ordinary
meaning-merchandise prizes as opposed to a prize consisting of currency or coin that the recipient
was free to take from the premises if he wished. While Caskey testified that in his opinion a gift
certificate was not a "noncash merchandise prize," the jury were free to disbelieve him. The jury
were also free to doubt his credibility based upon what appeared to be his hostility to section
47.01(4)(B). The jury could reasonably believe the subsection had a basis for being included as
part of the definition of "gambling device" and they were not free to disregard the definition
notwithstanding Caskey's apparent hostility to it.

 Similarly, the jury could reasonably doubt Matlock's general credibility based upon
his view that the tickets and gift certificates were not "noncash merchandise prizes." The jury
could reasonably conclude that further doubt was cast upon his credibility by other parts of his
testimony. He stated he could not describe a machine that could come within the exclusion of
section 47.01(4)(B), and the jury could reasonably believe the exclusion was included in the
statute because a machine could come within its terms. In much the same way, the jury could
reasonably doubt his credibility based upon his view that the word "amusement" precluded the
possibility of any kind of prize, notwithstanding that the exclusion read to the jury and given them
in the charge expressly contemplated that prizes of a certain kind could permissibly be awarded
under the exclusion. He conceded omitting from his report that the cash he had seen others
receive at the Monte Carlo, in exchange for tickets, had been used by them solely to continue
playing the machines; he did not know if the machines were "designed, made, and adapted solely
for amusement purposes," within the meaning of those words used in the statute; he did not know
if the machines had been tampered with while in the State's custody; and he admitted he had been
able to leave the Monte Carlo with cash only because he had first deceived an employee, by
representing he wanted the money to replay the machines, and then secreted the eleven dollars he
had been able to take from the premises. For these additional reasons, the jury could reasonably
doubt his testimony in general.

 We therefore conclude the State did not negate, as a matter of law, the exclusion
in section 47.01(4)(B); the jury's "no" answer to Special Question Number One is not against the
great weight and preponderance of the evidence; and, we may not reverse the judgment because
the jury should have answered the question "yes" given the great weight and preponderance of
the evidence.

 2. Whether the trial court erred in omitting from the jury charge an instruction that
section 47.01(4)(B) was a defense, and the legal effect of that defense. In our discussion above,
we concluded section 47.01(4)(B) did not constitute a defense but rather an integral and essential
part of the definition of "gambling device" set out in section 47.01(4). We hold, therefore, the
trial court did not err in the particulars claimed.

 3. Whether the trial court abused its discretion by admitting evidence concerning
alleged specific misconduct when that evidence was prejudicial and not relevant to the case. Over
the State's objection, Fenter was permitted to testify that a box containing $25,000 in United
States currency, inherited from his deceased mother's estate, was missing after the State's officers
raided the Monte Carlo and seized the various items of property alleged to be gambling devices,
gambling paraphernalia, and gambling proceeds. After the trial judge overruled the State's
objection to Fenter's testimony and a related State motion for a mistrial, the trial judge instructed
the jury that they could consider the testimony "if it aids them in any way as to the credibility of
[a] witness and for no other purpose."

 Caskey testified he was not involved in securing and counting currency seized by
State officers at the Monte Carlo; that was, he stated, Matlock's responsibility. Matlock testified
he was unaware of the box and thus did not include it or its contents, if any, in his inventory of
the property taken from the Monte Carlo.

 Fenter was unable to identify anyone who might have taken the box containing the
$25,000. The State argues his testimony was therefore prejudicial because it allowed the jury to
attribute the loss and implicit corruption to any person (Matlock or Caskey) who testified for the
State. The testimony, according to the State, was therefore admitted erroneously under Texas
Rules of Evidence 608(b) and 404(b). Rule 608(b) forbids extrinsic evidence of specific
misconduct by a witness for the purpose of attacking or supporting his credibility, except for
evidence showing conviction for a crime as provided in Rule 609. Rule 404(b) forbids the
admission of evidence of other wrongs or acts to prove the character of a person in order to show
he acted in conformity therewith on a particular occasion. We believe these rules are not
applicable here.

 Among the numerous properties listed in the State's Notice of Intended Forfeiture
was $29,061.93 in United States currency. The State alleged the $29,061.93 were gambling
proceeds seized at the Monte Carlo on the occasion in question. A controlling issue in the case
was, therefore, whether the $29,061.93 included any part or all of the missing $25,000 that Fenter
claimed he had received from his mother's estate. If credited, Fenter's testimony tended to
establish that the $25,000 was not gambling proceeds, that it was at the Monte Carlo before the
raid but missing afterward, and that it was not accounted for by the State which claimed to have
seized $29,061.93 in the raid.

 We believe Fenter's testimony did not refer to the character of a witness or another
person. Instead, it pertained naturally, directly, and immediately, in our view, to the source,
character, and composition of the $29,061.93 put in issue by the State's Notice of Intended
Forfeiture. Consequently, the testimony was both material and relevant. See Tex. R. Evid. 401,
402; In the Interest of C.Q.T.M., 25 S.W.3d 730, 736 (Tex. App.-Waco 2000, pet. denied); City
of Houston v. Leach, 819 S.W.2d 185, 190-91 (Tex. App.-Houston [14th Dist.] 1991, no writ). 
If any error occurred, it was perhaps in the limiting instruction given the jury. We hold the trial
court did not abuse its discretion in admitting the evidence.

 Finding no reversible error, we affirm the trial-court judgment.



 

 John E. Powers, Justice

Before Justices Patterson, Powers* and Jones; Justice Jones Not Participating

Affirmed

Filed: June 14, 2001

Publish






* Before John E. Powers, Senior Justice, (retired), Third Court of Appeals, sitting by
assignment. See Tex. Gov't Code Ann. § 74.003(b) (West 1998).
1. We note that section 47.01(4)(B) distinguishes between a "single play of the game or
device." Tex. Penal Code Ann. § 47.01(4) (West Supp. 2000). Matlock's statement does not
account for both possibilities, the game or the device, but only for a play of the device.
2. Section 47.01(4)(A) expressly contemplates machines that give awards "determined solely
or partially by chance." Id. § 47.01(4)(A). Section 47.01(4)(B) does not contain similar language. 
Id. § 47.01 (4)(B).



y, inherited from his deceased mother's estate, was missing after the State's officers
raided the Monte Carlo and seized the various items of property alleged to be gambling devices,
gambling paraphernalia, and gambling proceeds. After the trial judge overruled the State's
objection to Fenter's testimony and a related State motion for a mistrial, the trial judge instructed
the jury that they could consider the testimony "if it aids them in any way as to the credibility of
[a] witness and for no other purpose."

 Caskey testified he was not involved in securing and counting currency seized by
State officers at the Monte Carlo; that was, he stated, Matlock's responsibility. Matlock testified
he was unaware of the box and thus did not include it or its contents, if any, in his inventory of
the property taken from the Monte Carlo.

 Fenter was unable to identify anyone who might have taken the box containing the
$25,000. The State argues his testimony was therefore prejudicial because it allowed the jury to
attribute the loss and implicit corruption to any person (Matlock or Caskey) who testified for the
State. The testimony, according to the State, was therefore admitted erroneously under Texas
Rules of Evidence 608(b) and 404(b). Rule 608(b) forbids extrinsic evidence of specific
misconduct by a witness for the purpose of attacking or supporting his credibility, except for
evidence showing conviction for a crime as provided in Rule 609. Rule 404(b) forbids the
admission of evidence of other wrongs or acts to prove the character of a person in order to show
he acted in conformity therewith on a particular occasion. We believe these rules are not
applicable here.

 Among the numerous properties listed in the State's Notice of Intended Forfeiture
was $29,061.93 in United States currency. The State alleged the $29,061.93 were gambling
proceeds seized at the Monte Carlo on the occasion in question. A controlling issue in the case
was, therefore, whether the $29,061.93 included any part or all of the missing $25,000 that Fenter
claimed he had received from his mother's estate. If credited, Fenter's testimony tended to
establish that the $25,000 was not gambling proceeds, that it was at the Monte Carlo before the
raid but missing afterward, and that it was not accounted for by the State which claimed to have
seized $29,061.93 in the raid.

 We believe Fenter's testimony did not refer to the character of a witness or another
person. Instead, it pertained naturally, directly, and immediately, in our view, to the source,
character, and composition of the $29,061.93 put in issue by the State's Notice of Intended
Forfeiture. Consequently, the testimony was both material and relevant. See Tex. R. Evid. 401,
402; In the Interest of C.Q.T.M., 25 S.W.3d 730, 736 (Tex. App.-Waco 2000, pet. denied); City
of Houston v. Leach, 819 S.W.2d 185, 190-91 (Tex. App.-Houston [14th Dist.] 1991, no writ). 
If any error occurred, it was perhaps in the limiting instruction given the jury. We hold the trial
court did not abuse its discretion in admitting the evidence.

 Finding no reversible error, we affirm the trial-court judgment.



 

 John E. Powers, Justice

Before Justices Patterson, Powers* and Jones; Justice Jones Not Participating

Affirmed

Filed: June 14, 2001

Publish