**STATE of Texas, Appellant,**

v.

**ONE SUPER CHERRY MASTER VIDEO 8–LINER MACHINE, et al., Appellees.**

**No. 03–99–00751–CV.**

Court of Appeals of Texas, Austin.

June 14, 2001.

William F. Lewis Jr., Office of the Atty. Gen., for Appellant.

Richard D. Davis, Law Offices of Richard D. Davis, Eddie G. Shell, Shell & Associates, Burnet, Austin, for Appellee.

Before Justices PATTERSON, POWERS * and JONES.

---

\* Before John E. Powers, Senior Justice, (retired), Third Court of Appeals, sitting by as-

JOHN E. POWERS, Justice (Assigned).

The State of Texas appeals from a judgment rendered on the jury's verdict in a forfeiture action brought by the State against property owned by Alvin Ray Fenter and P.F.A. Corporation. *See* Tex.Code Crim. Proc. Ann. art. 18.18(b)-(g) (West Supp.2001). We will affirm the judgment.

The disputed property consists of thirty-two machines described as "eight liners," each of which is alleged to be a "gambling device" as that term is defined in section 47.01(4) of the Texas Penal Code; related articles alleged to be "gambling paraphernalia" as defined in section 47.01(6) of the Texas Penal Code; and, currency alleged to be "gambling proceeds" within the meaning of article 18.18(b) of the Code of Criminal Procedure. *See* Tex. Penal Code Ann. §§ 47.01(4), 47.01(6) (West Supp. 2001); Tex.Code Crim. Proc. Ann. art. 18.18(b).

The jury failed to find the disputed articles of property were gambling devices, gambling paraphernalia, or gambling proceeds. Based on the verdict, the trial court rendered judgment ordering that the property be returned to Fenter and P.F.A. Corporation from whom it had been seized by State officers. The State appealed to this Court on three issues.

1. *Whether the evidence is legally or factually insufficient to support the judgment.* The State complains the evidence is legally and factually insufficient to justify the jury's "no" answer to each of three special questions: (a) were any of the eight liners a gambling device; (b) were any of the other disputed articles gambling paraphernalia; and (3) were any of the cash items gambling proceeds? We concur with the position of Fenter and P.F.A.

signment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).

Corporation that the alleged gambling paraphernalia and gambling proceeds can have that character only if the eight liners are gambling devices. Consequently, we will discuss only that aspect of the evidence.

The Texas Penal Code, in section 47.01(4), defines as follows the term "gambling device":

(4) "Gambling device" means any electronic, electromechanical, or mechanical contrivance *not excluded under Paragraph (B)* that for a consideration affords the player an opportunity to obtain anything of value, the award of which is determined solely or partially by chance, even though accompanied by some skill, whether or not the prize is automatically paid by the contrivance. The term:

(A) includes, but is not limited to, gambling device versions of bingo, keno, blackjack, lottery, roulette, video poker, or similar electronic, electromechanical, or mechanical games, or facsimiles thereof, that operate by chance or partially so, that as a result of the play or operation of the game award credits or free games, and that record the number of free games or credits so awarded and the cancellation or removal of the free games or credits; and

(B) does not include any electronic, electromechanical, or mechanical contrivance designed, made, and adapted solely for bona fide amusement purposes if the contrivance rewards the player exclusively with noncash merchandise prizes, toys, or novelties, or a representation of value redeemable for those items, that have a wholesale value available from a single play of the game or device of not more than 10 times the amount charged to play the game or device once or $5, whichever is less.

Tex. Penal Code Ann. § 47.01(4) (emphasis added).

■ Before summarizing the material evidence, we should establish what the State was required to show in order to prove the eight liners were gambling devices within the definition of section 47.01(4). It is plain on the face of section 47.01(4) that the State was required first to show the eight liners came within the terms of section 47.01(4)(A), including the proviso that they were "not excluded under Paragraph B." The State contends, however, that it was not required to negate by its proof the applicability of the exclusion found in section 47.01(4)(B). We disagree. We believe the structure and text of section 47.01(4)(A) and (B) indicate a legislative intent that the definition of "gambling device" should be incomplete without *both* subsections (4)(A) and (4)(B)—that both subsections are integral and essential parts of a single statutory definition. *See State v. Wofford,* 34 S.W.3d 671, 675–76 (Tex.App.—Austin 2000, no pet.). Consequently, the State bore the additional burden of negating the applicability of section 47.01(4)(B) in order to prove the eight liners were gambling devices within the meaning of the entire statute. As discussed below, we believe the State's proof failed in this respect.

■ In connection with Special Question Number One, the term "gambling device" was defined by a quotation of section 47.01(4) in its entirety; that is to say, the quotation included subsection 47.01(4)(A) and the exclusion found in subsection 47.01(4)(B).

For the State to prevail on its *legal-*insufficiency complaint, we must be able to

conclude that no evidence supports the jury's failure to find the eight liners were gambling devices *and* that the entire record establishes as a matter of law that the eight liners *were* gambling devices within the statutory definition. *See Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 940 (Tex.1991). For the State to prevail on its *factual*-insufficiency complaint, we must be able to conclude, after consideration of all the evidence, that the jury's "no" answer is against the great weight and preponderance of the evidence, *and* we may reverse the judgment only if the great weight and preponderance of the evidence supports a "yes" answer. *See Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996); *Ames v. Ames,* 776 S.W.2d 154, 159 (Tex.1989). In our view, both complaints fail with respect to section 47.01(4)(B). We will summarize all the evidence material to that proposition.

The thirty-two eight liners were seized from premises known as the Monte Carlo operated by Fenter and P.F.A. Corporation. The eight liners bore tax stamps issued by the Comptroller and the conspicuous legend "For Amusement Only." The eight liners resemble slot machines and require quarters or paper currency in denominations of one, five, ten, or twenty dollars to play. The eight liners operate on a combination of skill and chance, according to some evidence; according to State witnesses, they operate purely by chance and a player can do nothing to enlarge his chances of winning. The eight liners differ from slot machines in that the former do not dispense money. Instead, eight liners record credits representing, in this instance, the player's winnings in denominations of one cent or five cents, depending upon the particular machine. A player having the requisite number of credits may, by pushing a button on his machine, cancel his existing credits and receive in return a ticket or tickets issued by the machine. Each ticket represented one-dollar. Five such tickets could be exchanged with a Monte Carlo employee for a five-dollar gift certificate redeemable for merchandise at any of four nearby mercantile establishments; or, at the customer's request his tickets could be exchanged for currency that a Monte Carlo employee would deposit in the machine of the customer's choice in order that he might continue playing. As stated below, the State adduced evidence that purported to vary the foregoing practice with respect to the employee depositing the currency in a machine in order that the customer might continue playing.

Fenter testified he purchased the eight liners; their internal computers controlled the machines and came "preset" from his supplier; he did not know how the computers worked; in buying the machines he directed that they be set "[t]o comply with the Texas statute"; and, so far as he understood, they were "designed, made, and adapted solely for bona fide amusement," that is to say, for "fun." He knew no reason why his machine did not comply with the law. A "single play" of the game, in his opinion, was a player's receiving one ticket from the machine he was playing, but Fenter was not sure that such was the meaning of the term "single play of the game or device" as that term is used in section 47.01(4)(B). When shown photographs of the thirty-two machines allegedly seized from the Monte Carlo by the State, Fenter stated he could not identify them with certainty as his machines because some of the machines portrayed in the photographs bore markings that were not put on his machines by him or his employees.

Joe Matlock, an employee in the Special Crimes Service of the Texas Department of Public Safety, testified he participated in the seizure of the eight liners taken

from the Monte Carlo. So far as he knew, the machines had not been tampered with since they were taken into State custody and placed in a storage facility in Round Rock. He did not, however, accompany the machines to that location. Afterward, he opened one of the stored machines and saw "tests" performed on them. Matlock did not know how many times the machines had been played since they were seized, but some were played while in storage; he did not know if disconnecting power from an eight liner changed its computer-controlled operation; nor did he know if the machine displayed in the courtroom for demonstration purposes was in the same condition as when it was seized from the Monte Carlo.

Matlock testified further that he did not know if the seized machines were "designed, made, and adapted solely for bona fide amusement purposes" as that term is used in section 47.01(4)(B), but in his opinion the word "amusement" meant that nothing of value whatsoever could be received as a result of playing a machine. Consequently, the seized machines were not, in his opinion, "solely for bona fide amusement purposes." He conceded, however, that he had never attempted to learn by investigation whether the seized machines were "designed, made, and adapted solely for bona fide amusement purposes."

Matlock gave it as his opinion that "a single play of the game or device" meant one push of the button on a machine,[1] causing the cylinders showing the various icons to rotate; the tickets issued by the machines did not have a wholesale value; and the gift certificates were not "non-cash merchandise prizes" within the meaning of section 47.01(4)(B). He conceded he could not describe a machine that could operate

so as to fit within the exclusion found in section 47.01(4)(B). Matlock testified that an eight liner displayed in court for demonstration purposes was in and of itself a gambling device within the meaning of section 47.01(4), in his opinion, but he admitted testifying to the opposite effect on deposition. He did not know if the computers ("circuitry boards") that controlled the operation of the machines had anything to do with whether they were gambling devices within the meaning of the statute.

Before the State's seizure of the machines, Matlock had gone "undercover" to the Monte Carlo to investigate the operation of eight liners there. He heard some patrons ask to exchange their tickets for "cash back to the machines," or simply "for cash." While in some instances the Monte Carlo employee would respond by depositing the currency into a machine selected by the customer, for renewed play, in other instances Matlock saw the employee simply give the currency to a customer who personally deposited it in a machine to continue playing.

Matlock played several machines. Each time he played, he won more than ten times the amount he bet; and, he saw others do the same. After overhearing other customers use the expression "cash back to the machine" or "cash back," he used the first expression in exchanging his tickets for cash. The Monte Carlo employee gave him sixteen dollars, five of which he deposited in a machine and eleven of which he put in his wallet and took with him, for evidence purposes, on leaving the Monte Carlo. While he saw others receive cash in exchange for their tickets, he conceded he was the only person who was able to take the cash from the premis-

---

1. We note that section 47.01(4)(B) distinguishes between a "single play of the *game* or *device*." Tex. Penal Code Ann. § 47.01(4) (West Supp.2000). Matlock's statement does not account for both possibilities, the game or the device, but only for a play of the device.

es. He conceded he could understand how the employee who gave him the sixteen dollars thought he was going to put the money back in a machine to continue playing, and admitted he had "deceived" the employee by representing that he wanted the cash to put back into a machine. He also admitted he did not include in his report of the investigation his observation that those who had received cash from a Monte Carlo employee used it solely to continue playing the machines.

Marshall Caskey was commander of the Special Crimes Service at the time the eight liners were seized at the Monte Carlo. Before his examination of the seized machines, he had almost no computer training and did not know how the machine operated. In his opinion, the eight liners operated purely by chance and, that being the case, there was no possibility section 47.01(4)(B) could apply;[2] a gift certificate is not a "noncash merchandise prize" within the meaning of section 47.01(4)(B); and, a "single play of the game or device," within the meaning of the statute, is simply one push of the button to start the cylinders rotating. He conceded he could not tell the jury from personal knowledge that any specific person had ever received more than ten times the amount of a "single play" of the seized machines. And, he admitted, every time anyone questioned his interpretation of "the statute" (section 47.01(4)(B)), he generally responded by saying, "you're just trying to confuse the issue."

The charge to the jury included a list of numerous propositions of which the trial judge had taken judicial notice. None of them bear on section 47.01(4)(B) and we need not refer to them for that reason.

We believe the jury could, based upon the evidence adduced, reasonably answer "no" to Special Question Number One which asked: "Do you find from a preponderance of the evidence that any of the property that is the subject of this suit is a gambling device?" It appears that no evidence was adduced that anyone left the Monte Carlo with cash except Matlock, who admitted he had received the cash from a Monte Carlo employee by deception and put part of it in his wallet while using the balance to continue playing the machines. And the jury were free to conclude, in our view, that the tickets obtained from the eight liners were exchanged for "noncash merchandise prizes," in the ordinary meaning of those words as used in section 47.01(4)(B). So far as the evidence indicates, the tickets were exchangeable solely for continued play of the machines or for gift certificates redeemable for merchandise at four area merchants. As used in the statute, the term "noncash merchandise prizes" implies its ordinary meaning— merchandise prizes as opposed to a prize consisting of currency or coin that the recipient was free to take from the premises if he wished. While Caskey testified that in his opinion a gift certificate was not a "noncash merchandise prize," the jury were free to disbelieve him. The jury were also free to doubt his credibility based upon what appeared to be his hostility to section 47.01(4)(B). The jury could reasonably believe the subsection had a basis for being included as part of the definition of "gambling device" and they were not free to disregard the definition notwithstanding Caskey's apparent hostility to it.

Similarly, the jury could reasonably doubt Matlock's general credibility based

---

**2.** Section 47.01(4)(A) expressly contemplates machines that give awards "determined solely or partially by chance." *Id.* § 47.01(4)(A).

Section 47.01(4)(B) does not contain similar language. *Id.* § 47.01(4)(B).

upon his view that the tickets and gift certificates were not "noncash merchandise prizes." The jury could reasonably conclude that further doubt was cast upon his credibility by other parts of his testimony. He stated he could not describe a machine that could come within the exclusion of section 47.01(4)(B), and the jury could reasonably believe the exclusion was included in the statute because a machine *could* come within its terms. In much the same way, the jury could reasonably doubt his credibility based upon his view that the word "amusement" precluded the possibility of any kind of prize, notwithstanding that the exclusion read to the jury and given them in the charge expressly contemplated that prizes of a certain kind *could* permissibly be awarded under the exclusion. He conceded omitting from his report that the cash he had seen others receive at the Monte Carlo, in exchange for tickets, had been used by them solely to continue playing the machines; he did not know if the machines were "designed, made, and adapted solely for amusement purposes," within the meaning of those words used in the statute; he did not know if the machines had been tampered with while in the State's custody; and he admitted he had been able to leave the Monte Carlo with cash only because he had first deceived an employee, by representing he wanted the money to replay the machines, and then secreted the eleven dollars he had been able to take from the premises. For these additional reasons, the jury could reasonably doubt his testimony in general.

We therefore conclude the State did not negate, as a matter of law, the exclusion in section 47.01(4)(B); the jury's "no" answer to Special Question Number One is not against the great weight and preponderance of the evidence; and, we may not reverse the judgment because the jury should have answered the question "yes"

given the great weight and preponderance of the evidence.

2. *Whether the trial court erred in omitting from the jury charge an instruction that section 47.01(4)(B) was a defense, and the legal effect of that defense.* In our discussion above, we concluded section 47.01(4)(B) did not constitute a defense but rather an integral and essential part of the definition of "gambling device" set out in section 47.01(4). We hold, therefore, the trial court did not err in the particulars claimed.

■ 3. *Whether the trial court abused its discretion by admitting evidence concerning alleged specific misconduct when that evidence was prejudicial and not relevant to the case.* Over the State's objection, Fenter was permitted to testify that a box containing $25,000 in United States currency, inherited from his deceased mother's estate, was missing after the State's officers raided the Monte Carlo and seized the various items of property alleged to be gambling devices, gambling paraphernalia, and gambling proceeds. After the trial judge overruled the State's objection to Fenter's testimony and a related State motion for a mistrial, the trial judge instructed the jury that they could consider the testimony "if it aids them in any way as to the credibility of [a] witness and for no other purpose."

Caskey testified he was not involved in securing and counting currency seized by State officers at the Monte Carlo; that was, he stated, Matlock's responsibility. Matlock testified he was unaware of the box and thus did not include it or its contents, if any, in his inventory of the property taken from the Monte Carlo.

Fenter was unable to identify anyone who might have taken the box containing the $25,000. The State argues his testimony was therefore prejudicial because it

**58**

allowed the jury to attribute the loss and implicit corruption to any person (Matlock or Caskey) who testified for the State. The testimony, according to the State, was therefore admitted erroneously under Texas Rules of Evidence 608(b) and 404(b). Rule 608(b) forbids extrinsic evidence of specific misconduct by a witness for the purpose of attacking or supporting his credibility, except for evidence showing conviction for a crime as provided in Rule 609. Rule 404(b) forbids the admission of evidence of other wrongs or acts to prove the character of a person in order to show he acted in conformity therewith on a particular occasion. We believe these rules are not applicable here.

Among the numerous properties listed in the State's Notice of Intended Forfeiture was $29,061.93 in United States currency. The State alleged the $29,061.93 were gambling proceeds seized at the Monte Carlo on the occasion in question. A controlling issue in the case was, therefore, whether the $29,061.93 included any part or all of the missing $25,000 that Fenter claimed he had received from his mother's estate. If credited, Fenter's testimony tended to establish that the $25,000 was not gambling proceeds, that it was at the Monte Carlo before the raid but missing afterward, and that it was not accounted for by the State which claimed to have seized $29,061.93 in the raid.

We believe Fenter's testimony did not refer to the character of a witness or another person. Instead, it pertained naturally, directly, and immediately, in our view, to the source, character, and composition of the $29,061.93 put in issue by the State's Notice of Intended Forfeiture. Consequently, the testimony was both material and relevant. *See* Tex.R. Evid. 401, 402; *In the Interest of C.Q.T.M.*, 25 S.W.3d 730, 736 (Tex.App.—Waco 2000, pet. denied); *City of Houston v. Leach,*

819 S.W.2d 185, 190–91 (Tex.App.—Houston [14th Dist.] 1991, no writ). If any error occurred, it was perhaps in the limiting instruction given the jury. We hold the trial court did not abuse its discretion in admitting the evidence.

Finding no reversible error, we affirm the trial-court judgment.

Justice JONES Not Participating.